United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 27, 2005**

Charles R. Fulbruge III
Clerk

REVISED JUNE 13, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-40844

CHARLENE SALGE,

Plaintiff - Appellee

versus

EDNA INDEPENDENT SCHOOL DISTRICT

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before WIENER, BARKSDALE, AND DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Edna Independent School District ("EISD") appeals the district court's grant of summary judgment in favor of former employee Charlene Salge on her First Amendment retaliation claim. We affirm.

## I.  FACTS & PROCEEDINGS

After she was fired from her longtime job of secretary at the local high school, Plaintiff-Appellee Charlene Salge brought actions against her former employer, EISD, for violations of (1) the Age Discrimination in Employment Act ("ADEA")[1] and (2) the

---

[1] 29 U.S.C. § 626 et seq.

First Amendment, the latter via 42 U.S.C. § 1983. Salge claimed that EISD Superintendent Bob Wells fired her either because of her age or because of her responses to questions posed by a local journalist about the resignation of Kenneth Airheart, the principal of the high school and Salge's direct supervisor. The district court dismissed Salge's ADEA claim but granted her motion for summary judgment on her First Amendment claim, which ruling EISD appeals.

In February 2002, Wells met with Airheart to discuss the latter's annual evaluation. Wells criticized Airheart's performance, including Wells's perception that Airheart did not adequately supervise his employees as Wells had expressed to Airheart on prior occasions that Salge's performance was deficient and had asked Airheart to fire her. Wells informed Airheart that he intended to recommend to the EISD School Board that Airheart's current employment contract not be extended. After hearing this evaluation, Airheart held a meeting with approximately forty employees of the high school, one of whom was Salge. He announced to the group that he had received the second worst performance evaluation of his life, that his contract had not been extended, and that he intended to resign because he did not wish to stay where he was not wanted.

Two days later, the local newspaper, the Jackson County Herald-Tribune, reported that Airheart was retiring. Some time during the weeks that followed, Cynthia Roberson, a reporter for

2

the newspaper, called the high school for information about another employee's resignation; Salge answered the phone when Roberson rang. Roberson stated in her deposition that she had called the high school because of the unusually large number of high-level school officials that were leaving at the same time, and that Airheart's retirement had quickly become the main subject of this conversation. Exactly what Salge said to Roberson is disputed.

In March, the newspaper published a second article about Airheart's departure, stating that his contract had not been "renewed." Salge denied telling Roberson that Airheart's contract was not being renewed, insisting instead that she had told Roberson that the contract was not being extended. Roberson corroborated Salge's version in her deposition and stated that she had used the wrong word in the article. Roberson admitted when questioned by opposing counsel, however, that she could not really recall whether Salge had said "renewed" or "extended."

Most EISD employees have two-year contracts, which are renewed every year. An EISD contract that is not renewed after reaching its end is effectively a termination of employment. A two-year contract that the school board declines to renew at the end of its first year, is referred to as a "non-extension." A non-extension of a contract does not necessarily result in termination of employment; rather it serves as a warning to the employee that, at the end of the second year, his contract might not be renewed. As a result, his employment will then terminate at the end of its

3

second year. Airheart's contract had not been <u>extended</u>, thus he had received a "warning"; but the second newspaper article erroneously stated that his contract had not been renewed, incorrectly implying that he had been fired contemporaneously.

When Airheart, other EISD employees, and EISD parents read the article, they became alarmed and expressed concern to Wells that personnel information had been released to the media. Airheart's concern was with the fact that the information was erroneous, whereas others expressed concern that confidential personnel information had been released.

Wells contacted Roberson, who told him that she had obtained her information regarding Airheart's contract status from Salge. The newspaper ran a correction approximately one week later, clarifying that Airheart's contract had not been extended and that he could have elected to stay in his current position, but that he chose to resign. <u>Wells never discussed any of the articles with Salge</u>.

Approximately two months later, Wells discharged Salge for releasing confidential information to the media in violation of school district policies that prohibit employees from discussing confidential personnel matters and from contacting the media about school district news. Wells testified in his deposition that Salge was terminated for violating both of these policies.

Salge filed suit alleging that she was fired either because of her age in violation of the ADEA, or because of her responses to

4

Roberson's questions, in violation of her First Amendment right of free speech. She filed a motion for partial summary judgment on her First Amendment claim, to which EISD responded and filed a cross-motion for summary judgment on the same issue, subsequently filing a motion for summary judgment on Salge's ADEA claim. The district court granted EISD's motion for summary judgment on Salge's age discrimination claim but held in Salge's favor on the First Amendment claim, awarding her backpay, frontpay, damages for mental anguish, attorney fees, and costs. That ruling is the subject of this appeal.[2]


## II.   ANALYSIS

### A.   Standard of Review

We review grants or denials of motions for summary judgment de novo.[3] Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a

---

[2] Salge also asserts on appeal that EISD's media policy, prohibiting its employees from directly contacting the press, violates the First Amendment. This issue was not properly presented to the district court, however, as Salge did not allege it in her complaint and did not provide the district court with a copy of the policy. To be preserved for appeal, an issue must have been raised in the trial court to the extent necessary to allow that court to rule on it. Vogel v. Veneman, 276 F.3d 729, 733 (5th Cir. 2002)(citing In re Fairchild Aircraft Corp., 6 F.3d 1119, 1128 (5th Cir. 1993)). We therefore decline to address this contention.

[3] MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 478 (5th Cir. 2003).

5

matter of law.[4]  "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."[5] We consider the evidence in the light most favorable to the nonmovant.[6]

De novo is also our standard for reviewing district court rulings that concern First Amendment issues, in which instances we examine the whole record.[7]  Whether the speech at issue is on a matter of public concern is a question of law that must be determined by the court.[8]  And, our review of the district court's Pickering balancing analysis is, in the absence of any disputed, material facts, also de novo.[9]

B.   First Amendment Retaliation

To prevail on a First Amendment employment retaliation claim, an employee must establish four elements: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) his speech motivated the employer's adverse employment

---

[4] Id.

[5] Webb v. Cardiothoracic Surgery Assocs., 139 F.3d 532, 536 (5th Cir. 1998).

[6] Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

[7] Denton v. Morgan, 136 F.3d 1038, 1042-43 (5th Cir. 1998).

[8] Tompkins v. Vickers, 26 F.3d 603, 606 (5th Cir. 1994).

[9] See Kinney v. Weaver, 367 F.3d 337, 363 (5th Cir. 2004).

action.[10]  None disputes that Salge has satisfied the first element, as she was fired, or the fourth element, as her speech motivated Wells to fire her:  Wells readily acknowledges that he fired Salge because of her statement to the press.  Thus, the elements that remain to be examined are (1) whether Salge's speech involved a matter of public concern, and (2) if so, whether her First Amendment interest in her speech outweighs EISD's interest in promoting efficiency.[11]

    1.   Speech on a Matter of Public Concern

        a.   Content: What Salge Actually Said

The parties dispute the content of Salge's speech, specifically, whether Salge stated to Roberson that Airheart's contract was not renewed or that it was not extended.  They also argue about which version we should consider in our determination whether Salge's speech is on a matter of public concern.  The district court concluded that this argument was a red herring, as both versions of the statement address a matter of public concern.

It is true that the Supreme Court's Churchill v.

_____

[10] Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999).

[11] EISD does not dispute that Wells is a final decision-maker and therefore EISD may be held liable under § 1983 for his decision to terminate Salge.  See Johnson v. Louisiana, 369 F.3d 826, 831 (5th Cir. 2004)("[O]nly final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983.").

7

Waters[12] decision held that, when a plaintiff-employee's First Amendment retaliation claim rests on a disputed version of his speech, a court applying the Supreme Court's Connick v. Myers[13] test to determine whether the speech was on a matter of public concern must examine the speech as the defendant-employer reasonably believed it to be.[14] EISD argues that Wells reasonably believed that Salge had violated the school's confidentiality and media policies and had provided false information to the newspaper; this reasonable belief justified Wells's decision to terminate Salge, EISD argues, because (1) if Salge used the term "renewed," then her speech was false and therefore unprotected and (2) whether true or false, she had violated school district policies against divulging confidential personnel information and speaking to the media. We evaluate these arguments, however, as part of our Pickering balancing test to determine whether EISD's interest in efficiency outweighs any interest Salge has in making her speech. Whether the speech in question violates an employer's policy has no relevance to whether the subject matter of the speech is on a matter of public concern. Whether an employee's speech is true or false also plays no role in the determination whether the speech

---

[12] 511 U.S. 661 (1994)(plurality opinion).

[13] 461 U.S. 138 (1983).

[14] Johnson, 369 F.3d at 832 (internal citation omitted).

concerned a matter of public interest.[15]

In Churchill, unlike the instant case, the difference between the two versions of the employee's speech was determinative, as one version implicated protected speech and the other did not. The Churchill employer understood the employee's comments to be personal criticism of her supervisor, which was not First Amendment protected speech.[16] The employee insisted that she criticized the employer's cross-training policy, which would have been protected speech.[17]

In contrast, the parties in this case dispute whether Salge said that Airheart's contract had not been extended or had not been renewed. Salge's speech indisputably concerned the high school principal's resignation, so whether she used the word "renewed" or "extended," is immaterial: Her point was that Airheart resigned grudgingly, as a result of the non-extension of his contract and his own feeling that he was unwanted and unappreciated. We are satisfied that, under either version, Salge's speech concerned the high school principal's employment status and his reasons for resigning before the end of the term of his employment. This is the speech we evaluate in our determination whether Salge spoke on a matter of public concern, and this evaluation does not implicate

---

[15] Denton v. Morgan, 136 F.3d 1038, 1043 (5th Cir. 1998).

[16] 511 U.S. at 665-66.

[17] Id.

9

<u>Churchill</u>.

  b.  <u>Public Concern</u>

"Whether an employee's speech addresses a matter of public concern must be determined by the <u>content</u>, <u>form</u>, and <u>context</u> of a given statement, as revealed by the whole record."[18] When a public employee speaks in his capacity as an employee and addresses personal matters such as personnel and employment disputes, rather than in his capacity as a citizen on a matter of public interest, his speech falls outside the protection of the First Amendment.[19] When the speech in question merely touches on an element of personal concern in the broader context of a matter of public concern, however, a court is not precluded from concluding that an employee's speech as a whole addresses a matter of public concern.[20]

In <u>Kennedy v. Tangipahoa Parish Library Board of Control</u>, we reviewed many of our First Amendment retaliation opinions.[21] In <u>Kennedy</u>, we gleaned principles from these previous decisions that are useful in determining whether in a "mixed speech" case, i.e., a case in which an employee's speech contains elements of both personal and public concern, the subject speech nevertheless

---

[18] <u>Connick</u>, 461 U.S. at 147-48 (emphasis added).

[19] <u>Kennedy v. Tangipahoa Parish Library Bd. of Control</u>, 224 F.3d 359, 366 (5th Cir. 2000)(citing <u>Connick</u>, 461 U.S. at 147).

[20] <u>Id.</u> at 365.

[21] <u>Id.</u>

10

addresses public concern.[22]   Salge's speech undoubtedly included an element of personal concern, as she was speaking about the employment status of her direct supervisor, which in turn affected the conditions of Salge's employment.[23]   Still, in such cases, we found that asking only whether an employee spoke in his capacity as a concerned citizen or an employee yields uncertain results, as the presence of some personal interest does not necessarily preclude a holding that the speech at issue is on a matter of public concern as well.   Thus, in mixed speech cases we proceed to analyze the form, content, and context of the employee's speech.[24]

The first principle identified in Kennedy is that a matter of public concern does not involve "solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government."[25]   That opinion goes on to clarify that "[i]f releasing the speech to the public would inform the populace of more than the

[22] Id. at 366, 372.

[23] See Teague v. City of Flower Mound, 179 F.3d 377, 381 (5th Cir. 1999) ("[S]peech concerning the conditions of one's employment is a private matter."); Moore v. City of Kilgore, 877 F.2d 364, 371-72 (5th Cir. 1989)(stating that employee's speech concerning local fire department's staffing shortage, while a matter of public concern because it involved the department's ability to effectively fight fires, also included an element of personal concern as the employee was criticizing his employer's policy).

[24] Kennedy, 244 F.3d at 366-67.

[25] Id. (citing Wilson v. Univ. of Tex. Health Ctr., 973 F.2d 1263 (5th Cir. 1992)).

fact of an employee's employment grievance, the content of the speech may be public in nature."[26]

The second Kennedy principle (one that is relevant to the "context" factor), teaches that speech on a matter of public concern need not be made before a public audience, although "it may relate to the public concern if it is made against the backdrop of public debate."[27] By way of example, we cited Harris, in which we had held that there was an ongoing public debate concerning the subject matter of the plaintiff's speech, namely, problems with the local high school's academic performance. In Harris, faculty members and parents phoned school board members to discuss the school's problems, citizens stopped one board member in a grocery store and at church to discuss the situation, and the local newspaper ran a story about the high school's low performance rating.[28] The audience before whom the employee speaks[29] and whether the employee speaks in

---

[26] Id.

[27] Kennedy, 224 F.3d at 372. See also Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 222 (5th Cir. 1999).

[28] Kennedy, 224 F.3d at 372; Harris, 168 F.3d at 222.

[29] Bradshaw v. Pittsburg Indep. Sch. Dist., 207 F.3d 814, 817 (5th Cir. 2000)(per curiam)(stating that the fact that an employee chose to file internal grievances rather than publicize her complaints weighed in favor of finding that the employee's speech was private rather than public); Victor v. McElveen, 150 F.3d 451, 456 (5th Cir. 1998)(noting that the plaintiff's awareness of a journalist's presence while engaging in the disputed speech supported a finding that he spoke on a matter of public concern); Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 800 (5th Cir. 1989)(noting the fact that the plaintiff never spoke publicly, to colleagues, supervisors, or the public,

response to an invitation[30] may also be relevant to an analysis of the context in which an employee's speech is offered.

Finally, we declared in <u>Kennedy</u> that speech is not on a matter of public concern if it is made solely in "furtherance of a personal employer-employee dispute."[31] Typically, an employee speaks in

about the matter at issue in support of a holding that the plaintiff spoke on a matter of private concern); <u>Terrell v. Univ. of Tex. System Police</u>, 792 F.2d 1360, 1362 (5th Cir. 1986) (holding that, as the plaintiff never made an effort to communicate speech in his diary to the public, he did not speak on a matter of public concern). <u>But</u> <u>see</u> <u>Givhan v. W. Line Consol. Sch. Dist.</u>, 439 U.S. 410, 413 (1979)(holding a teacher's private communication with principal concerning alleged racially discriminatory policies to be protected by the First Amendment).

[30] <u>See</u> <u>Harris</u>, 168 F.3d at 222.

[31] 224 F.3d at 372. <u>See</u> <u>also</u> <u>Connick v. Myers</u>, 461 U.S. 138, 148 (1983)(holding that questions posed by plaintiff's survey to other employees "reflect[ed] one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre" and were therefore not matters of public concern); <u>Bradshaw</u>, 207 F.3d at 817 (holding that a high school principal's private memos to the Board concerning her unfavorable performance evaluations were not a matter of public concern); <u>Harris</u>, 168 F.3d at 222 (pointing out, when evaluating the extent of employee's personal interest in their speech, that "[t]here is no evidence that the [p]laintiffs' speech merely concerned an employment related squabble with their supervisor."); <u>Victor</u>, 150 F.3d at 456 ("Victor spoke as a citizen on a matter of public concern, not as an employee upon matters only of personal interest. At the time of his remarks, Victor was well pleased with his position as a courtroom bailiff; there was no evidence that he was a disgruntled employee or had any personal reason to protest what he perceived to be the potential racially discriminatory effects of the sheriff's approach to the new program."); <u>Kirkland</u>, 890 F.2d at 799 ("If the nature of the speech is purely private, such as a dispute over one employee's job performance. . ."); <u>Terrell</u>, 792 F.2d at 1363("Terrell was not terminated for speaking 'as a citizen upon matters of public concern. . .' or for 'speak[ing] out as a citizen on a matter of general concern, <u>not tied to a personal employment dispute</u>. . .")(citing <u>Connick</u>, 461 U.S. at 148

13

furtherance of his personal employer-employee dispute when he discusses personnel matters directly impacting his job or criticizes other employees or supervisors' job performance.[32]

### i.  Context

The context factor weighs in Salge's favor, because of (1) her position as the high school secretary, (2) her responsibility for maintaining good communications between the school and the community, (3) her thirty-three years of experience in the school system, and (4) Airheart's prominent position in the community.  We concur with the district court's determination that, for these reasons, Salge's speech was of interest to community members and of greater importance because of her familiarity with the issues faced by the school district.[33]

Salge's comments were also made against a background of existing community debate.[34]  The record before us confirms beyond cavil that, at all times pertinent to this case, administration of the Edna high school was an item of considerable interest in that

n.8)(emphasis in original).

[32] Kirkland, 890 F.2d at 798 n.10.

[33] See Kinney v. Weaver, 367 F.3d 337, 361 (5th Cir. 2004)(en banc)(holding that, as individuals placed in law enforcement such as police academy instructors "are often in the best position to know" about issues of public concern related to law enforcement, these individuals should be able to speak out freely).

[34] Kennedy, 224 F.3d at 372 ("[Speech] may relate to a matter of public concern if it is made against the backdrop of public debate.").

14

small community —— in fact, EISD admits as much in its brief.  The newspaper published several articles about Airheart's resignation, one before Salge spoke; the reporter initiated the contact with Salge, not vice versa; citizens called the school regarding the issue; and members of the community approached Wells in the grocery store —— an overall situation closely analogous to that detailed by the Harris court in support of its conclusion that the context element weighed in favor of holding that the employee spoke on a matter of public concern.[35]

Salge also introduced more than fifty articles from newspapers in the Edna area addressing school district personnel matters, including the hiring, removal, or departure of school principals and officials.  EISD argues that the focus of community debate shifted from Airheart's resignation to EISD's termination of Airheart after the appearance of the second article; however, we agree with the district court that the topic of the debate was the cessation of Airheart's and other EISD employees' statuses at EISD, and that whether Airheart felt compelled to resign or did so voluntarily was an issue that could be interwoven within the broader community debate.

EISD next counters that public interest in Airheart's departure from EISD should not render Salge's statement protected.  For this proposition, EISD cites Terrell v. University of Texas System

---

[35] 168 F.3d at 222-23.

Police.[36]  In Terrell, it is true that we focused on whether the plaintiff spoke as a citizen or an employee, not on whether members of the public had an interest in the matter discussed by the employee.  We did so because "almost anything that occurs within a public agency could be of concern to the public."[37]  We held in Terrell that the plaintiff's speech was not protected because, although it concerned police corruption, a matter of inherent public interest, the speech was made only in a private diary which the plaintiff never intended to make public and therefore could not have been intended to speak on a matter of public interest.[38]

Our Terrell holding, however, is more accurately characterized as one in which we completely discounted the content of an employee's speech because the context element weighed so heavily against a holding of protected speech.  The interpretation of Terrell advanced by EISD in urging that we disregard whether the content of an employee's speech actually interests the public, is contradicted by other precedent.  In Kennedy, for example, we expressly stated that "[t]he very fact of newspaper coverage [of the matter discussed by the employee] indicates that 'the public was receptive and eager to hear about' [the matter]."[39]  We conclude that

---

[36] 792 F.2d 1360 (5th Cir. 1986).

[37] Id. at 1362 (emphasis in original).

[38] Id. at 1363.

[39] Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 373 (5th Cir. 2000) (citing Moore v. City of Kilgore,

16

the context element weighs solidly in Salge's favor.

ii. Form

As for the form of her speech, Salge was responding to an unsolicited inquiry from a member of the community who was also a member of the press. The fact that an employee responds to an invitation to speak rather than initiating the speech weighed heavily in favor of finding speech on a matter of public concern in Harris, in which teachers had been invited to join a school committee investigating the high school's performance and were subsequently invited to report findings on ways in which the school could be improved.[40]

EISD argues that, in Harris and other invited speech cases, the employee responded to an invitation to speak issued by the employer itself, and that these cases stand for the proposition that it is not fair to ask an employee her opinion and then punish her when she responds truthfully.[41] We also emphasized in Harris that another important reason for this consideration is that, when employees have been asked to speak by a truth-finding body, to punish them for

877 F.2d 364, 371 (5th Cir. 1989)(noting that the fact that the media approached the employee-speaker and printed his responses to their questions demonstrated public interest and concern in the employee's statements and supported a holding that the employee's speech involved a matter of public concern)).

[40] 168 F.3d at 222.

[41] Id.

responding inhibits the truth-seeking process.[42]   Even though fairness and protecting the truth-seeking process are important reasons to protect employees who respond to invitations to speak, an invitation to speak that has issued from the public, particularly from the press, demonstrates the public's interest in the matter and therefore weighs in favor of holding an employee's speech protected.

EISD disputes this characterization of the form of Salge's speech.  It argues that Salge's affidavit and deposition contradict each other and that Salge's deposition testimony, which indicated that she was responding only to a question posed by Roberson rather than engaging in a conversation about the large numbers of officials leaving the school district's employ, supports a holding that Salge was merely engaged in gossip about personnel matters with a friend rather than responding to an invitation to speak from a reporter. In her affidavit, Salge said that Roberson asked her why the school district could not keep good people and that she replied with the information about Airheart's resignation.  In her deposition, Salge said that she did not discuss personnel matters in general but that the conversation focused specifically on Airheart.  These two statements are not necessarily contradictory, however, as Salge's affidavit states that she responded to a question, not that she herself discussed personnel matters.  Importantly, Roberson's statements corroborate Salge: Roberson stated that she called the

_____

[42] Id.

18

high school because it was unusual for so many school officials to leave the school district's employ at about the same time.

Moreover, even if we were to view Salge's affidavit and deposition testimony as inconsistent, this would not change our characterization of the form of her speech.[43]  It is undisputed that Salge responded to a question posed by a reporter who had called the school to inquire about why personnel were leaving.  Also uncontradicted is Salge's response about Airheart's leaving, answering, in essence, that he did not want to stay where he was not wanted but that she wished that Airheart would not retire because he was good for the school and the community.  Even if Salge's testimony as to precisely how Roberson posed her question is disregarded, there is ample evidence — including Roberson's testimony, the previous newspaper article, and Wells's own testimony that members of the community were talking about Airheart's resignation — that Airheart's leaving the school district was a matter of public knowledge and public concern by the time Roberson called the school and talked to Salge.  Irrespective of whether Salge actually participated in a discussion with Roberson about the school districts' employment woes, merely responded to a question, or was talking only about Airheart's departure from the high school,

_____

[43] We also note that, if we were to find any contradiction between Salge's affidavit and deposition testimony, it would not create a disputed issue of material fact that would prevent a grant of summary judgment, as the essential facts of what Salge said and the fact that Roberson called her and posed the question, are undisputed.

19

there is no question that she responded to a question from a reporter and was talking about the school's loss of its principal. We conclude that the form of Salge's speech also supports holding that she spoke on a matter of public concern.

### iii. Content

The content of Salge's speech also weighs in favor of holding that she spoke on a matter of public concern. The undisputed summary judgment evidence shows that Salge and Roberson were discussing Airheart's retirement, and that Salge was not embroiled in a dispute with EISD over her employment status or her own job performance.[44] Her speech did not relate to her own employment at all, but to the impending departure of a high-profile individual within the system who just happened to be her supervisor. Although EISD urges that Salge had a personal interest in her speech because Wells had wanted Airheart to fire her for some time, it produced no evidence that, at the time that Salge spoke with Roberson, she had any idea that Wells wanted her fired. The record evidence shows that Salge received uniformly positive work evaluations and that there were no written complaints with respect to her work before her termination.

EISD argues that Salge answered the phone in her capacity as secretary, as it was her duty to do, and therefore spoke in her

---

[44] See Kennedy, 224 F.3d at 372 (stating that speech is not on a matter of public concern if it is made in "furtherance of a personal employer-employee dispute.").

capacity of employee, not citizen.  Although EISD does not express this argument in terms of the content, context, or form of Salge's speech, it may be fairly characterized as a statement that, because it was Salge's job to answer the phone, anything she may have said to a reporter, irrespective of the subject, could not have been on a matter of public concern.  Even if the fact that Salge was performing her job duties when she answered the phone does insert a personal concern into the mix, it does not necessarily render her speech unprotected per se; rather it is but one factor that we consider.  We note, nonetheless, that if EISD's argument were accepted it would undermine First Amendment protection for employees who speak at work while working:  Any speech made by an employee whose job it is to answer the phone would be rendered unprotected, if the speech occurred during a telephone conversation.[45]  We also conclude that, even though this presents a closer question than the context or form of Salge's speech, the content factor, too, weighs in Salge's favor.

Relevant to all three factors discussed above, EISD tries to liken this case to Bradshaw v. Pittsburg Independent School District, in which we held that a disgruntled high school

---

[45] See Wilson v. Univ. of Tex. Health Ctr., 973 F.2d 1263, 1269 (5th Cir. 1992)(holding that the fact that the plaintiff had a duty to report sexual harassment did not render her speech about her own harassment unprotected, as "such a rule would permit public employers to remove constitutional protection from speech on certain subjects by including those subjects within employees' reporting duties.").

21

principal's intra-office memos complaining about non-extension of her contract did not constitute speech on a matter of public concern.[46] Bradshaw is easily distinguishable. First, the principal was complaining only about her own contractual status, not discussing the employment of someone else, much less general public employment matters. Second, there was no demonstrated public interest in her employment, as there was with Airheart's and other school employees in this case. Finally, unlike Salge, the school principal in Bradshaw never communicated her concerns to a public audience, writing only in intra-office memos.

Although Salge's speech does not reveal official corruption, discrimination, or other such "hot button" policy issues that we have held to be indisputably matters of public concern,[47] the form and context of her speech — responding to a reporter against a

_____

[46] 207 F.3d at 817.

[47] See Johnson v. Louisiana, 369 F.3d 826, 830-31 (5th Cir. 2004)("Reporting sexual harassment is speech of 'great public concern.'")(quoting Wilson, 973 F.2d at 1269); Kennedy, 224 F.3d at 373 n.14 (contrasting unprotected speech about working conditions, such as length of time on the job and the number of breaks employees receive, with protected speech about "policy changes occasioned by the violent rape of a coworker"); Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 222-23 (5th Cir. 1999)(holding criticism of school principal for not properly implementing a plan to improve the high school to be speech on a matter of public concern); Victor v. McElveen, 150 F.3d 451, 456 (5th Cir. 1998)("The content of Victor's speech was inherently of public concern because it was a protest against racial discrimination."); Moore v. City of Kilgore, 877 F.2d 364, 370 (5th Cir. 1989)(holding that staffing shortages at the Fire Department, which might threaten the ability of the Department to perform its duties, to be matters of public concern).

backdrop of high interest and wide discussion on this topic within the community — mandate the conclusion that, as a matter of law, Salge spoke on an issue of public concern. The summary judgment evidence demonstrates that this topic was a very high-profile issue in the community at the time, differentiating Salge's speech from unprotected gossip by an employee about disputed personnel matters. Even if Salge's speech contained an element of personal concern to the extent it related to the departure of her boss or even personnel disputes within the EISD, her central point — that Airheart was not leaving voluntarily — goes to the heart of the public conversation about why so many EISD personnel were leaving. We hold that Salge has demonstrated that her speech was on a matter of public concern.

2.  <u>Pickering</u> Balancing: Employee Free Speech versus Employer's Interest in Efficiency

In balancing the relative importance of Salge's First Amendment rights against EISD's interest in the efficient furnishing of public services, we must consider whether Salge's "statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."[48]  When we do so, however, we must remain mindful that "[c]reating room for free speech in a hierarchical organization

_____

[48] <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987); <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968).

23

necessarily involves inconveniencing the employer to some degree."[49]

EISD continues to urge, again citing <u>Waters v. Churchill</u>,[50] that we should evaluate the inefficiencies caused by Salge's speech in the framework of what Wells reasonably believed that Salge said. EISD contends that Wells reasonably believed that Salge's speech had breached school district policy against dissemination of confidential personnel information, and that Wells discharged Salge based on his concern that she had or would cause significant disruption by revealing such information. EISD insists that <u>Churchill</u> permits an employer to take action to prevent the disruption that it reasonably believes will result from an employee's speech.

EISD's interpretation of <u>Churchill</u> is correct as far as it goes. The aspect of <u>Churchill</u> that EISD fails to address, however, is the truism that, before an employer may justifiably discharge an employee on a belief that the employee's speech has caused or will cause significant disruption to the workplace, <u>the employer must undertake a reasonable investigation of the facts to determine what the employee actually said.</u>[51] This indispensable prerequisite does not impose an onerous burden on the employer, yet Wells never bothered to satisfy the requirement of conducting a reasonable

---

[49] <u>Moore</u>, 877 F.2d at 375.

[50] 511 U.S. 661 (1994).

[51] <u>Id.</u> at 678.

24

investigation into Salge's speech before he terminated her employment.[52]  In fact, <u>Wells never asked Roberson what Salge said</u> — he only asked Roberson "where she got the information."  And, Roberson's only reply was that she had spoken to Salge, <u>not</u> that Salge had said that Airheart's contract was "not extended."  Without ever addressing the content of Salge's conversation with Roberson, much less specifically discussing the nuances of "extended" vis-à-vis "renewed," Wells — by his own admission — merely replied, "Okay.  That's all I needed to know."  Moreover, both Salge and Wells confirmed that they <u>never</u> discussed the speech for which Salge was fired.

Generally, without at least asking an employee what she said, an employer's indispensable investigation into whether an employee's speech was protected will not be reasonable.  In <u>Churchill</u>, the investigation approved by the Supreme Court comprised the employer (1) thrice interviewing the employee who originally complained about Churchill's speech, (2) questioning another employee who had witnessed the conversation for corroboration, and (3) most significantly, conversing with the employee whose speech was at issue.[53]  Although the Court noted that the employer had not

_____

[52] <u>See</u> <u>id.</u> ("[An investigation] need not be [conducted with] the care with which trials, with their rules of evidence and procedure, are conducted.  It should, however, be the care that a reasonable manager would use before making an employment decision — discharge, suspension, reprimand, or whatever else — of the sort involved in the particular case.").

[53] 511 U.S. 661, 666 (1994)(plurality opinion).

interviewed the plaintiff before telling her that she was fired, it relied on the fact that, after her discharge, the plaintiff filed an internal grievance and was afforded a meeting with the hospital president to tell her side of the story.[54]  And, even then, before making the plaintiff's employment termination final, the hospital conducted yet another interview with the employee who had originally complained about the plaintiff's speech and sought assurances of all employees' credibility from supervisors.[55]  The Court summarized the evidence before the employer as follows:

> By the end of the termination process, Hopper, who made the final decision, had the word of two trusted employees, the endorsement of those employees' reliability by three hospital managers, and the benefit of a face-to-face meeting with the employee he fired. With that in hand, a reasonable manager could have concluded that no further time needed to be taken.[56]

Wells's investigation also fell far short of any investigation that we have ever held to be reasonable.  In Johnson v. Louisiana, for example, we upheld as reasonable an employer's investigation of an employee's speech after (1) it received statements from three employees, (2) it obtained a supervisor's report stating that the supervisor believed that the plaintiff was lying, and (3) the plaintiff "fail[ed] to present any evidence in his own support even

---

[54] Id. at 680.

[55] Id.

[56] Id.

26

when explicitly invited to do so."[57]

These investigations obviously differ dramatically from the de minimis one conducted by Wells in this case, i.e., doing absolutely nothing but to ask Roberson where she got her information. Wells essentially conducted no investigation, despite the fact that he knew about the previous newspaper article, the community's interest in Airheart's resignation, and the 40-person meeting at which Airheart had announced his resignation, all before Salge spoke with Roberson. And, Wells must be deemed to have been on notice that Salge's First Amendment rights could be affected.[58]

EISD relies primarily on the role of Wells's "reasonable" belief that Salge had disclosed confidential information in his decision to terminate her to show that Salge's speech caused or had the potential to cause serious disruption to the school district's functioning. Had Wells conducted a reasonable investigation of what Salge actually said, he would have known immediately that she did not divulge confidential information: Airheart had effectively waived any confidentiality rights by revealing the information in

_____

[57] Johnson v. Louisiana, 369 F.3d 826, 832 (5th Cir. 2004)(emphasis in original). See also Gonzales v. Dallas County, 249 F.3d 406, 412 (5th Cir. 2001)(holding an investigation in which the employer interviewed numerous witnesses to incident involving employee, including employee himself, to be reasonable).

[58] See Churchill, 511 U.S. at 677 ("If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care.").

27

the 40-person meeting that he convened and conducted — he also stated in his deposition that he did not consider this information confidential.

EISD argues additionally on appeal that Wells also "believed" that Salge had formerly made inappropriate remarks about confidential matters at school, and that this belief supported his deduction that she had divulged confidential information to the newspaper. Even assuming arguendo that this were true, we would still hold that Wells's failure at least to ask Salge what she said to the reporter bars a conclusion that his investigation of her speech was a reasonable one.

EISD also points out that, when Airheart called Wells to complain about the release of inaccurate information to the press, Airheart did not volunteer the fact that he had revealed his contractual status to a great many EISD employees at a meeting, and that this also justifies Wells's belief that Airheart's contractual status was confidential. We emphasize, however, that Churchill requires that employers make a reasonable investigation of an employee's speech before taking adverse employment action. Relying on other employees and third parties to come forward sua sponte with exculpatory information does not qualify as an investigation at all, much less a reasonable one.[59] We therefore do not weigh in EISD's favor the putative disruption that Salge's

---

[59] 511 U.S. at 677.

28

speech might conceivably have caused had she actually divulged confidential information, as —— absent a real investigation —— it was not reasonable for Wells to believe that she had divulged anything confidential.[60]

It might have been reasonable for Wells to believe, even after asking Salge about her conversation with Roberson and gathering any other appropriate information, that Salge gave <u>inaccurate</u> information to the newspaper.[61] Again, without asking Salge what she said to the reporter or asking the reporter if Salge actually spoke the word "renewed," Wells was not entitled to make and rely on his "quantum leap of logic" that the inaccurate statement in the paper came from Salge rather than being the result of a misunderstanding or mis-printing by the paper.

EISD also argues that Wells did not think it necessary to inquire further after Roberson told him that the information came from Salge, as he assumed that the inaccuracy was Salge's statement; it also points out that neither Roberson nor Salge ever told Wells that the inaccuracy in the paper was not a result of Salge's speech.

---

[60] <u>See</u> <u>id.</u> at 680 (holding that the court should consider the potential disruption resulting from the speech that the employer <u>reasonably believed</u> had been made).

[61] It is possible that, if Wells had asked Salge about her speech, been told that she used the word "extended," and then asked Roberson for confirmation, Roberson might have contradicted Salge's statement, and Wells could have reasonably believed that Salge mis-spoke. <u>See</u> <u>Churchill</u>, 511 U.S. at 678 ("Of course, there will often be situations in which reasonable employers would disagree about who is to be believed. . .").

This contention gets EISD nowhere. First, the one and only inaccuracy in the newspaper article was its use of a single word, "renewed," as opposed to "extended." Had the paper printed a lengthy report about Airheart, full of distortions, lies, mistakes, and innuendo; and had Roberson told Wells that all of such information came from Salge, Wells _might_ have been justified in his belief that Salge had furnished inaccurate information to the newspaper. In this case, when but one word separates false from accurate information, we conclude that it is not reasonable to assume, as Wells did, that the inaccuracy resulted from an employee's speech without at least asking the employee or the journalist exactly what the employee said. We further note, as indicated above, that it is not the responsibility of employees and third parties to volunteer all relevant information to employers as part of an employer's "reasonable" investigation under Churchill.[62] We therefore proceed to balance the value of Salge's non-confidential, accurate speech, against EISD's interest in efficiency for purposes of our Pickering analysis.

EISD offers four examples of how Salge's speech purportedly disrupted its operations: (1) Her speech affected the working relationship between Wells and Airheart; (2) it upset EISD board members and members of the community; (3) it caused Wells to spend valuable time correcting the erroneous statement in public; and (4)

---

[62] 511 U.S. at 677-78.

it cast the school district in a negative public light.[63]  EISD also contends that the value of Salge's speech was very low, as it amounted to little more than gossip in the workplace about a personnel matter, and should accordingly count for little in opposition to the inefficiency experienced by EISD.

First, although the working relationship between Wells and Airheart was undoubtedly strained, this strain was certainly the result, in principal part, of Well's unfavorable evaluation of Airheart's work and his non-extension of the principal's contract. The very fact that, prior to Salge's speech, Airheart assembled and told a meeting of forty employees that he had received the second-worst evaluation of his life and would not stay where he was not wanted, nullifies the contention that Salge's speech produced the strained relationship between Wells and Airheart.

Second, many members of the community had already expressed concern regarding Airheart's resignation before the newspaper published Roberson's article grounded in part on Salge's responses to that reporter's questions.  EISD produced no evidence that the community's concern created such turmoil <u>after</u> the publication of the article that it impaired the school's operations.[64]  Wells stated

---

[63] Although EISD states that Salge violated its policy against contacting the media, it did not provide the court with a copy of this policy or cite this policy in support of its interest in efficiency under <u>Pickering</u>.

[64] <u>See</u> <u>Moore v. City of Kilgore</u>, 877 F.2d 364, 375 (5th Cir. 1989)(holding that, as the employee firefighter's speech did not hinder the ability of his employer, the Fire Department, to

that, after Airheart held the meeting at which he announced the non-extension of his contract and his intention to resign, Wells received a number of phone calls from high school staff members, students were upset that Airheart was leaving, and members of the community approached Wells to discuss the situation.

Wells could not recall whether individuals outside the school system actually called him to discuss the matter before the appearance of the article, or only afterwards. Wells did confirm that members of the community approached him to discuss Airheart's resignation while he was in the grocery or otherwise out in the community, although he may not have received phone calls until after publication of the second article. Wells also testified in his deposition, conclusionally, that, after the article was published, these disruptions "escalated," yet he did not describe what effect these disruptions had on EISD's operations or how the disruption

perform its primary task of fighting fires, as opposed to causing a general burden on the efficient operation of the city as an organization, the employer's interest in efficiency was entitled to little weight as opposed to the employee's speech). See also Pickering v. Bd. of Educ., 391 U.S. 563, 572 (1968)(emphasizing that plaintiff teacher's speech did not disrupt the operation of the schools); Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 378 (5th Cir. 2000)("[The plaintiff's] letter would not have impeded the Library's general performance and operation: it did not have any bearing on the day-to-day business of circulating books within the community.") These cases illustrate that, when we evaluate the impact of a plaintiff's speech on a defendant employer's operations, we inquire whether the speech impacted the actual operations of the employer in providing its day-to-day services, such as the circulating of books at the library or the continuation of classes at school, as opposed to creating a bureaucratic hassle.

became more severe.  Moreover, EISD produced no evidence from anyone other than Wells that Salge's speech caused any disruption at all.[65] Any additional disruption arising out of Salge's alleged divulgence of confidential or inaccurate information cannot, as we explained above, be attributed to Salge for purposes of our <u>Pickering</u> balancing.

As for the waste of Wells's time, EISD produced no evidence that the amount of time that Wells devoted was any greater than it would have been if caused by an employee's protected, if somewhat controversial, speech.[66]  Wells did not state, nor did EISD produce any other evidence to show, that he spent an inordinate amount of time putting out brush fires in the community <u>after</u> the appearance of the inaccurate article.  In fact, no summary judgment evidence indicates how much time Wells spent dealing with the alleged disruption in the school district, much less that he spent enough time to disrupt operations of the district.

Finally, even though EISD has an interest in its reputation, Salge's speech concerning Airheart's employment status could not be said to have cast the district in a "negative public light."

---

[65] <u>Moore</u>, 877 F.2d at 375 (noting that the defendant employer presented no evidence, other than the testimony of one supervisor, that the plaintiff's speech actually created any disruption to the employer's work).

[66] <u>See</u> <u>id.</u> ("Creating room for free speech in a hierarchical organization necessarily involves inconveniencing the employer to some degree.  Speech concerning public affairs usually creates attendant inefficiencies in the running of the public entity.").

Indeed, Salge said nothing about the district at all, and the disputed newspaper article did not even identify its source of information as an employee of the district. As EISD does not elaborate further on this argument, we shall not engage in conjecture as to how Salge's comment might have negatively portrayed the school district.

EISD has failed to demonstrate any disruption to its working environment or the running of the schools that is not easily outweighed by speech of even moderate First Amendment value. We do not suggest that, if an employer were to undertake a reasonable investigation of an employee's speech and determine that the employee inappropriately divulged confidential information, this fact would not weigh heavily in favor of an employer's interest in efficiency in the Pickering balancing test. Rather, we emphasize that such is not the case before us, and that we discount Wells's belief that Salge revealed confidential information because he failed to conduct any kind of reasonable investigation into the substance of her speech. If he had conducted a meaningful investigation and then mistakenly determined that her speech did include confidential information, his belief on this matter would have weighed in favor of EISD; but, again, that is not what the record reveals here.

The disruption alleged by EISD does not outweigh Salge's interest in speaking on a matter of confirmed public interest in her community, especially when analyzed as to context, form, and

content. Although it is unfortunate that Salge either misspoke or Roberson misquoted Salge in the paper, there is no evidence that Salge's speech caused such an uproar —— or, to be more precise, elevated an existing uproar —— as to impair the functioning of the school district even temporarily. We conclude that Pickering's balance beam tips solidly in favor of Salge.

## III. CONCLUSION

Salge spoke on a matter of public concern and, given the dearth of evidence produced by EISD to show that her speech either actually or potentially interfered with or disrupted the functioning of the school district, we conclude that she was fired in violation of her First Amendment rights. We therefore affirm in all respects the district court's grant of summary judgment in favor of Salge on her First Amendment retaliation claim.

AFFIRMED.