Sheila GOUDEAU

v.

## EAST BATON ROUGE PARISH SCHOOL BOARD, et al.

**Civil Action No. 10–303–FJP–SCR.**

United States District Court, M.D. Louisiana.

July 31, 2012.

Craig Sterling Watson, Baton Rouge, LA, for Sheila Goudeau.

Carla S. Courtney–Harris, Pamela Wescovich Dill, Hammonds & Sills, Baton Rouge, LA, Karen D. Murphy, Murphy's Law, APLC, Geismar, LA, for East Baton Rouge Parish School Board, et al.

## *RULING*

FRANK J. POLOZOLA, District Judge.

This matter is before the Court on the Motion for Summary Judgment by the defendants.[1] Plaintiff has filed an opposition to the motion.[2] No oral argument is required on this motion. For reasons which follow, Defendants' motion is granted in part and denied in part.

### I. Factual Background

Plaintiff Sheila Goudeau ("Plaintiff") is a certified teacher employed by the East Baton Rouge Parish School Board and is currently teaching at Villa del Rey Elementary School. Prior to holding this position, she taught at Riveroaks Elementary School from 2001 to 2009. Shilonda Shamlin ("Shamlin") became principal of Riveroaks in 2006. Both parties agree that initially, Plaintiff and Shamlin enjoyed a

1. Rec. Doc. No. 20.

2. Rec. Doc. No. 25.

good working relationship. The record reveals that Plaintiff volunteered in various ways to assist Shamlin, and also served on several school committees, including the School Improvement Team where she kept minutes of the monthly meetings.

Plaintiff taught fifth grade until the 2008–2009 school year, when she was reassigned to teach the fourth grade by Shamlin. It was during this time that Plaintiff claims that Shamlin directed her "both verbally and in writing" to change students' grades from an "F" to a "D." Plaintiff also claims she was directed not to give a student a grade lower than a 60. Plaintiff contends she tried on many occasions to give her students the proper grade which they earned, but she was circumvented by not only Shamlin, but by the office secretary responsible for actually placing the students' grades on the report cards. Plaintiff contends that there were several occasions when the office secretary changed the grades the Plaintiff gave to the student to a higher grade. Plaintiff also alleges that not only was she given a directive by Shamlin to change grades but other fourth grade teachers at Riveroaks were given the same directive from Shamlin about changing grades.

During grade level meetings Plaintiff attended with other fourth grade teachers, Plaintiff claims Shamlin announced to the teachers that no grade could be given to a student that was less than a 60 so the child would have the opportunity to bring up the grade. Plaintiff also claims Shamlin's "Monday Morning Memos" also set forth this mandatory grade change policy. Plaintiff contends none of the fourth grade teachers agreed with Shamlin's grading policy, but the teachers followed the man-

date out of fear they would receive repercussions from Shamlin.

Plaintiff states that as a result of the pressure of this grading policy and the harassment she suffered for speaking out about it, she also began suffering from stress, anxiety, and crying spells. In fact, Plaintiff alleges that the same year she was nominated for teacher of the year, Shamlin transferred her to another school. In support of her motion, Plaintiff has offered deposition testimony of other teachers who testified that they were harassed into implementing Shamlin's grading policy and threatened by Shamlin if they failed to follow the grading policy. Plaintiff contends that she was personally threatened with being written up by Shamlin and also was threatened with a transfer if she did not comply with Shamlin's grading policy.

Plaintiff reported Shamlin's grading policy to Paula Johnson, Assistant Superintendent for Instructional Support for the East Baton Rouge Parish School Board and the supervisor for Riveroaks Elementary. She received complaints about Shamlin's Monday Morning Memos, but characterized these as "personal" issues. Johnson allegedly investigated the grading complaint but ultimately concluded that Shamlin's instructions did not change grades because "an F was still an F."[3]

On May 9, 2009, Plaintiff filed an "Official Complaint Against Employee Form," which prompted a Level I meeting with Shamlin on May 22, 2009, which Plaintiff claims was abruptly ended when she refused to sign a letter written by Shamlin and presented to the Plaintiff. At the Level III hearing held by Herman Brister, Interim Chief Academic Officer, it

---

**3.** This finding makes no sense to the Court. The Court does not understand how raising a student's grade actually helps the student. To require a teacher to raise a grade the student did not earn not only hurts the child but in my view constitutes cheating by the very people who should be teaching the child.

was found that Shamlin "failed to adhere to the Board approved grading scale outlined in the Pupil Progression Plan for the 2008–2009 school year."[4] When asked in his deposition if Shamlin asked someone to change a grade from a 38 to a 60, for example, would this violate the Pupil Progression Plan, Brister testified in the affirmative, as he should have. Superintendent John Dilworth, who succeeded Charlotte Placide as Superintendent of the East Baton Rouge Parish School Board, also confirmed his belief that Shamlin failed to follow the grading plan, but took no action against Shamlin stating he "didn't oversee it close enough."[5]

Plaintiff filed suit against the Defendants alleging that she suffered retaliation for asserting her First Amendment right to free speech, violation of substantive due process under the 14th Amendment, violation of 42 U.S.C. § 1983, and a claim under the Louisiana Whistleblower Statute codified at Louisiana Revised Statute 23:967.

Defendants acknowledge the directive by Shamlin to change low Fs to high Fs, referring to this practice as "helping the students succeed."[6] Defendants state this "culture of helping students succeed" was reflected in Shamlin's October 8, 2007 Monday memorandum.[7] Defendants contend Plaintiff never expressed her problems with Shamlin's policy until 2009, after the relationship between Shamlin and Plaintiff had deteriorated due to her move to fourth grade and Shamlin's issues with Plaintiff's teaching performance after observation. Defendants concede that Bris-

ter concluded at the Level III Grievance Hearing that Shamlin's policy technically violated the Pupil Progression Plan, but also note that Brister found insufficient evidence to show that Shamlin actually directed any teacher at Riveroaks to change students' grades.[8]

Defendants contend Plaintiff was not reprimanded in any way for choosing not to give her students a 50/60 F rather than the grade actually earned. The Defendants fail to explain the policy was in violation of the Board's rules. Defendants further contend Plaintiff knew of the grading policy in 2007 when she took the minutes of the meeting where this policy was initially discussed, and did not complain about the grading policy until 2009 after her relationship with Shamlin had already deteriorated. This argument fails to take into consideration that it was Shamlin who violated the Board's policy whether the Plaintiff or any other teacher complained about it. Defendants move for summary judgment on all of plaintiff's claims.

The Court now turns to a discussion of the law and jurisprudence applicable to this case.

## II. Law and Analysis

### A. Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

4. Rec. Doc. No. 25, Exhibit 10.

5. Rec. Doc. No. 27–5, p. 31.

6. Rec. Doc. No. 20–16, p. 4.

7. How can you educate the student if the grade given does not actually reflect what the student knows?

8. It is difficult for this Court to understand how there was insufficient evidence to show Shamlin directed a teacher to change grades when the summary judgment evidence clearly shows this was the policy and defendants' lawyers concede in their pleadings that Shamlin did direct the fourth grade teachers to change grades.

judgment as a matter of law." [9] The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [10] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." [11] If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." [12]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.[13] The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[14] Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." [15] The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." [16] Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[17]

■ In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." [18]

### B. Retaliation for First Amendment Right to Free Speech

■ To prove a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must show: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on such matters outweighed the government employer's interest in promoting efficiency; and (4) her speech motivated the adverse em-

9. Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir.1996).

10. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir.1995).

11. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (*quoting Celotex*, 477 U.S. at 323–25, 106 S.Ct. at 2552).

12. *Id.* at 1075.

13. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046–47 (5th Cir.1996).

14. *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047.

15. *Wallace*, 80 F.3d at 1048 (*quoting Little*, 37 F.3d at 1075). *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir.1996).

16. *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir.1995).

17. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

18. *Id.* at 248, 106 S.Ct. at 2510.

ployment action.[19]

■ Public employees do not surrender all their free speech rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern.[20] However, "[t]his prospect of [First Amendment] protection ... does not invest them with a right to perform their jobs however they see fit." [21] The relationship between a speaker's expressions and employment is a balancing test. A public employee's speech is protected by the First Amendment when the interests of the worker "as a citizen in commenting upon matters of public concern" outweigh the interests of the state "as an employer, in promoting the efficiency of the public services it performs through its employees." [22]

■ The United States Supreme Court's pronouncement in *Garcetti v. Ceballos* added a threshold layer to the *Pickering* balancing test.[23] Under *Garcetti*, courts must shift focus from the content of the speech to the role the speaker occupied when he or she said it. Emphasizing the distinction between a speaker acting in her role as "citizen" and her role as "employee," *Garcetti* held that the First Amendment does not protect "expressions made pursuant to their official duties." [24] Even if the speech is of great social importance, it is not protected by the First Amendment as long as it was made pursuant to the worker's official duties.[25]

■ The *Garcetti* court did not explain what it means to speak "pursuant to" one's "official duties," although we know that a formal job description is not dispositive, nor is speaking on the subject matter of one's employment.[26] The Supreme Court held in *Garcetti* that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." [27]

### 1. Adverse Employment Decision

■ Defendants contend plaintiff cannot satisfy this prong of the test because she is still employed with the School Board, suffered no reduction in job duties or in her salary, sustained no reprimands, and her claim for "fear of future retaliation" fails under Fifth Circuit jurisprudence to constitute an adverse employment action.

Plaintiff argues that, because of the many threats made by Shamlin, she was forced to transfer to another school that was not on the same prestigious level as Riveroaks. Plaintiff also contends she can prove that her transfer was the result of her complaints about Shamlin's grading system. Plaintiff also contends her new position is less prestigious, less interesting, not as appealing, with less room for ad-

---

19. *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir.2004).

20. *See, Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *United States v. National Treasury Employees Union*, 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

21. *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006).

22. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

23. *Garcetti*, 126 S.Ct. at 1951.

24. *Id.* at 1960.

25. *Id.*

26. *Id.* at 1961.

27. *Id.* at 1959–60.

vancement as the previous position she held.

The Fifth Circuit has stated: "We recognize that federal courts should be extremely hesitant 'to invade and take over' in the area of education; a federal court is not the appropriate forum in which to seek redress over 'faculty disputes concerning teaching assignments, administrative duties, classroom equipment, teacher recognition, and a host of other relatively trivial matters.' " [28] The court continued: "However, we have repeatedly held that reprimands and demotions constitute adverse employment decisions." [29] The Fifth Circuit has also recognized "that 'a plaintiff's subjective perception that a demotion has occurred is not enough' to constitute an adverse employment decision." [30]

As the district court determined and the Fifth Circuit affirmed in *Harris v. Victoria Independent School District*, "this case does not involve a mere administrative change in teaching assignments, but a mid-term transfer to an entirely different school, and in Martin's case, unfamiliar subjects and grade levels." [31]

Plaintiff relies on the Fifth Circuit's decision in *Sharp v. City of Houston*,[32] where

the court stated: "Employer actions that can result in liability include more than just actual or constructive discharge from employment. Adverse employment actions can include discharges, demotions, refusals to hire, refusals to promote, and reprimands." [33] The court continued that "an adverse employment action can include a transfer, because it may serve as a demotion." [34] Further, "[t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse-such as being less prestigious or less interesting or providing less room for advancement." [35]

In *Sharp*, the city had argued that because Sharp requested the transfer, it could not be deemed "adverse." The court rejected this argument, noting that, "the jury reasonably could equate the transfer with a demotion, and the city did not initiate the transfer to protect Sharp but rather waited until she felt compelled to request a transfer." [36]

The Court finds that plaintiff has created a genuine issue of material fact as to whether her transfer was, in fact, an adverse employment action under the law and facts of this case. There are simply

**28.** *Harris v. Victoria Independent School District et al.*, 168 F.3d 216, 220–21 (5th Cir. 1999), quoting *Dorsett v. Board of Trustees for State Colleges & Universities*, 940 F.2d 121, 123–24 (5th Cir.1991) (citing *Connick v. Myers*, 461 U.S. 138, 138–39, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

**29.** *Id.* at 221, citing *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir.1998) (noting that a formal reprimand constitute an adverse employment decision); *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir.1997) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.") (citing *Pierce v. Texas Dep't of Crim. Justice, Inst. Div.*, 37 F.3d 1146, 1149 (5th Cir.1994)).

**30.** *Id.*, quoting *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir.1996).

**31.** *Id.* at 221, n. 7.

**32.** 164 F.3d 923 (5th Cir.1999).

**33.** *Id.* at 933 (internal citations omitted).

**34.** *Id.*, citing *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir.1996); *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir.1992) *Fyfe v. Curlee*, 902 F.2d 401, 404–05 (5th Cir.1990); *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1099 (5th Cir.1987).

**35.** *Id.*, citing *Forsyth*, 91 F.3d at 774; *Click*, 970 F.2d at 109.

**36.** *Id.* at 934.

too many conflicts in the evidence to grant Defendants' motion for summary judgment on this issue.[37]

## 2. Matter of Public Concern

■■■ Plaintiff must also show that she has spoken on a "matter of public concern." " 'In order for speech by a public employee to enjoy constitutional protection from retaliation by a public employer, the speech must involve a matter of public concern.' "[38] For speech "to rise to the level of public concern, the plaintiffs must speak primarily in their roles as citizens rather than as employees addressing matters only of personal concern."[39] The Fifth Circuit has stated: "We look to the content, form, and context of the speech, as revealed by the whole record, in determining whether the Plaintiffs' speech addresses a matter of public concern.[40] Determining whether speech meets this threshold is a fact specific analysis."[41] Also, "[a]n employee's speech may contain an element of personal interest and yet still qualify as speech on a matter of public concern."[42]

The Fifth Circuit has recognized that in some instances, the employee's speech may be "mixed speech," containing elements of both personal and public concern.[43] In these types of cases, the Fifth Circuit has stated that "we found that asking only whether an employee spoke in his capacity as a concerned citizen or an employee yields uncertain results, as the presence of some personal interest does not necessarily preclude a holding that the speech at issue is on a matter of public concern as well."[44]

■■ In a case involving "mixed speech," a court must first note that "a matter of public concern does not involve 'solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government.' "[45] Additionally, " '[i]f releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature.' "[46] Second, the court must consider that "speech on a matter of public concern need not be made before a public audience, although 'it may relate to the public concern if it is made against the backdrop of public debate.' "[47] Third, the court must consider

---

37. The evidence creates even greater issues of fact because Shamlin was violating a Board rule and one could interpret her actions from the facts as trying to force teachers to follow this illegal rule or suffer consequences.

38. *Harris*, 168 F.3d at 221, quoting *Denton v. Morgan*, 136 F.3d 1038, 1042 (5th Cir.1998) (citing *Connick v. Myers*, 461 U.S. at 147, 103 S.Ct. 1684.).

39. *Id.*

40. *Id.*, citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684; *Benningfield*, 157 F.3d at 375.

41. *Id.*, citing *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 461–62 (5th Cir.1990).

42. *Id.*, citing *Benningfield*, 157 F.3d at 375; *Thompson*, 901 F.2d at 463–65.

43. *See Kennedy v. Tangipahoa Parish Library Board of Control*, 224 F.3d 359, 366 (5th Cir.2000), *abrogated on other grounds by Cuvillier v. Taylor*, 503 F.3d 397 (5th Cir.2007).

44. *Salge v. Edna Independent School District*, 411 F.3d 178, 186 (5th Cir.2005).

45. *Id.*, quoting *Kennedy*, 224 F.3d at 366–67 (citing *Wilson v. Univ. of Tex. Health Ctr.*, 973 F.2d 1263 (5th Cir.1992)).

46. *Id.*, quoting *Kennedy*, 224 F.3d at 366–67.

47. *Id.* at 187, quoting *Kennedy*, 224 F.3d at 372; *see also, Harris*, 168 F.3d at 222.

that "speech is not on a matter of public concern if it is made solely in 'furtherance of a personal employer-employee dispute.' [48] Typically, an employee speaks in furtherance of his personal employer-employee dispute when he discusses personnel matters directly impacting his job or criticizes other employees or supervisors' job performance." [49]

Defendants contend Plaintiff in this case has a personal conflict with Shamlin which she is attempting to elevate to a matter of public concern. Defendants also contend Plaintiff's complaints relate solely to a dispute with her employer over her job performance or employment status and do not rise to the level of matters of public concern.

Plaintiff counters that the implementation of Shamlin's grading system was in violation of established Louisiana law, and when Shamlin forced her and other teachers to change students' grades, it was an illegal act on the part of Shamlin as well as a violation of School Board policy. Plaintiff contends that while her job duties did involve grading students, they did not include changing grades at Shamlin's direction. Plaintiff further argues she did not have an official duty to report Shamlin's illegal act; thus, doing so was not "in furtherance of her official job duties."

■ The Court finds that there is no question that a school employee with supervisory powers requiring teachers to follow her rule that a teacher must change students' grades in violation of established Louisiana law and school board policy is a matter of public concern. The Court finds the facts fail to show this dispute was merely an inter-office employment squabble over teaching practices and job performance. The Court finds that releasing the speech, i.e., that a school principal was implementing a grading policy which was in clear violation of state law and School Board policy, to the public "would inform the populace of more than the fact of an employee's employment grievance." This finding supports the Court's conclusion that Plaintiff's speech was at least partially public in nature. Also, the Court notes that Plaintiff's speech does not have to be made before a public audience to be considered public in nature as was discussed and held in Salge.

Plaintiff contends, and the Court agrees, that her speech qualifies as "mixed speech," insofar as the speech was public in addressing the grading system in the public school system implemented by an illegal act and its resulting effect on the public (i.e., children's education), the students who were supposed to be educated, and private as it was against Plaintiff's personal morals, ethics, and teaching principles and her desire to follow Louisiana law and School Board policy.

Plaintiff has satisfied the Court that her speech was on a matter of public concern. Therefore, the Court must apply the *Pickering* balancing test.

### 3. *Pickering* Balancing Test

■ The Court now turns to a consideration of whether Plaintiff's interest in free speech "outweighs 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.' " [50] In striking this

48. *Id.*, quoting *Kennedy*, 224 F.3d at 372 (internal citations omitted).

49. *Id.* at 187–88, citing *Kirkland v. Northside Independent School Dist.*, 890 F.2d 794, 798 n. 10 (5th Cir.1989).

50. *Harris*, 168 F.3d at 223, quoting *Victor v. McElveen*, 150 F.3d 451, 457 (5th Cir.1998) (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

balance, the Court must "examine whether the speech was likely to generate controversy and disruption, impeded the school's general performance and operation, and affected working relationships necessary to the department's proper functioning."[51]

■ The Court sees no evidence from the Defendants to suggest that Plaintiff's speech disrupted the school's operations or performance. In fact, the Court finds Plaintiff's speech against the grading policy which violated Louisiana law promotes, rather than impedes, the interests of the state. Quite frankly, the Plaintiff should have been applauded by the School Board for her actions. At least Plaintiff brought to their knowledge that Shamlin was using an illegal grading system and requiring her teachers to also violate Louisiana law and School Board policy.

### 4. Causal Connection

■ Plaintiff must also show that her speech motivated the adverse employment action taken against her. The Court finds that Plaintiff has presented sufficient summary judgment type of evidence to create a genuine issue of material fact regarding whether Shamlin's threatened reprimands and alleged threats against her were in response to Plaintiff's refusal to follow the illegal grading policy. Further, the Court agrees with the Fifth Circuit that "[w]hether the employee's conduct was a substantial or motivating factor in an employer's decision to take actions against

the employee is a question of fact, ordinarily rendering summary disposition inappropriate."[52] This is the status of the case at this time.

### C. Qualified Immunity

Plaintiff has sued the East Baton Rouge Parish School Board, and Charlotte Placide, who was Superintendent of the East Baton Rouge Parish School Board at the time the problems in this case began, and Shilonda Shamlin in both their official and individual capacities. Defendants contend they are entitled to qualified immunity on all claims.

■ The law is clear that "qualified immunity shields certain public officials performing discretionary functions from civil damage liability if their actions could reasonably have been thought consistent with the rights they are alleged to have violated."[53] Whether a particular defendant is entitled to qualified immunity is a two step inquiry. First, a court must determine whether the plaintiff alleged a violation of a clearly established constitutional right.[54] Second, the court must determine whether the defendant's conduct was "objectively reasonable in light of clearly established constitutional law."[55] "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"[56]

---

**51.** *Id.,* citing *Brawner v. Richardson,* 855 F.2d 187, 192 (5th Cir.1988) (citing *Pickering,* 391 U.S. at 569–73, 88 S.Ct. 1731).

**52.** *Click v. Copeland,* 970 F.2d 106, 113 (5th Cir.1992).

**53.** *Harris,* 168 F.3d at 223, citing *Duckett v. City of Cedar Park,* 950 F.2d 272, 279 (5th Cir.1992) (citing *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

**54.** *Id.,* citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

**55.** *Id.,* citing *Hayter v. City of Mount Vernon,* 154 F.3d 269, 274 (5th Cir.1998).

**56.** *Mendenhall v. Riser,* 213 F.3d 226, 230 (5th Cir.2000) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

### 1. School Board

 The School Board contends, and the Court agrees, that a local government entity such as the School Board cannot be held liable under 42 U.S.C. § 1983 under a *respondeat superior* theory;[57] the alleged violation must constitute the official act, policy, or custom of the district.[58] A plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."[59]

 The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority.[60] "[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable."[61] Further, " 'municipal liability attaches only where the decisionmaker possesses the final authority to establish municipal policy with respect to the action ordered.' "[62] Whether an official possesses the final policymaking authority for purposes of municipal liability is a question of state and local law.[63]

 Finally, the plaintiff must "demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."[64] "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.' "[65]

The School Board argues that Plaintiff has failed to identify any policy or custom by the School Board which routinely violates employees' rights to free speech. The School Board also contends Plaintiff has failed to present any evidence that the School Board acted with deliberate indifference to Plaintiff's federally protected rights through the investigation and grievance process.

Plaintiff contends that she has shown genuine issues of material fact that there was a policy, custom, or practice within the East Baton Rouge Parish School Board which allowed Shamlin's implementation of an illegal grading policy. The record reflects that Plaintiff reported this grading policy to Paula Johnson, Assistant Super-

---

57. The School Board could be held liable under the doctrine of *respondeat superior* under state law. Because there are two separate and conflicting federal and state rules, the Court believes it would be in the interest of justice and judicial economy to separate the state and federal claims as will be discussed below.

58. *See Doe v. Dallas Independent School Dist.,* 153 F.3d 211, 215 (5th Cir.1998); *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

59. *Valle v. City of Houston,* 613 F.3d 536, 541–42 (5th Cir.2010), quoting *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir.2002) (citing *Piotrowski,* 237 F.3d at 578).

60. *Id.* at 542, citing *Burge v. St. Tammany Parish,* 336 F.3d 363, 369 (5th Cir.2003).

61. *Id.,* quoting *Brown v. Bryan County,* 219 F.3d 450, 462 (5th Cir.2000).

62. *Id.,* quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

63. *Id.,* citing *Pembaur,* 475 U.S. at 482, 106 S.Ct. 1292.

64. *Bd. of the County Comm'rs v. Brown,* 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

65. *Valle,* 613 F.3d at 542, quoting *Piotrowski v. City of Houston,* 237 F.3d 567, 579 (5th Cir.2001) (quoting *Brown,* 520 U.S. at 407, 117 S.Ct. 1382).

intendent for Instructional Support for the East Baton Rouge Parish School Board. During her deposition, Johnson testified that she had been advised about Shamlin's Monday Morning Memos and the fact that other teachers were concerned about this grading policy. Upon investigating, Johnson testified that she discovered it was a "group decision" to give no grade lower than a 60. Because Johnson determined that "an F is still an F," and it was a "group decision" made by the school, she believed the policy caused no harm and did nothing to stop it. Johnson also testified that each school in East Baton Rouge Parish was authorized and in fact required to organize a "site-based decision-making committee," within which decisions may be made regarding budget, practices and procedures, and the like.[66]

Plaintiff contends that this "group decision-making" on such matters constitutes a policy within the East Baton Rouge Parish School Board which allowed such groups to implement a practice which was clearly illegal under existing Louisiana law. Furthermore, Plaintiff contends that although Johnson and other supervisor-level officials within the School Board learned of this practice, they permitted the illegal practice to continue with the knowledge that such practice was in violation of Louisiana law and School Board policy. This, Plaintiff contends, is evidence of deliberate indifference to Plaintiff's constitutional right to speak against, and refuse to participate in, such unlawful activity as grade changing.

Louisiana Revised Statute 17:414.2 provides as follows:

A. No school board member, school superintendent, assistant superintendent, principal, guidance counselor, other teachers, or other administrative staff members of the school or the central staff of a parish or city school board shall attempt, directly or indirectly, to influence, alter, or otherwise affect the grade received by a student from his teacher except as otherwise specifically permitted by this Section.

B. (1) A teacher's determination of a student's grade as a measure of the academic achievement or proficiency of the student shall not be altered or changed in any manner by any school official or employee other than the teacher except as provided in this Subsection.

(2) A school official or employee having authority pursuant to formally adopted written rules and procedures adopted by the governing authority of the public elementary or secondary school to change a student's grade can take such action only upon it being determined that the grade is an error or that the grade is demonstrably inconsistent with the teacher's grading policy.

C. A teacher's determination of a student's grade as a measure of the academic achievement or proficiency of the student shall not be used in any manner as a basis for assessing or evaluating the teacher's performance except for grade changes occurring pursuant to the provisions of this Section.

The Court finds that there are genuine issues of material facts surrounding the existence of a known policy by the School Board and its deliberate indifference to the rights of Plaintiff (and any other teachers who may have objected) to assign grades in accordance with their First Amendment rights and in compliance with well-known Louisiana law. There are clearly material issues of fact which makes it impossible for the Court to determine as a matter of law whether the School Board is entitled to

---

66. Rec. Doc. No. 25, Exhibit 17, p. 31.

qualified immunity at this stage of the record. The Court finds it curious and disturbing that although Herman Brister concluded Shamlin's illegal grade policy was a violation of the Pupil Progression Plan (and should have also concluded it was a violation of Louisiana law and School Board policy), no action was taken against Shamlin and it appears from the record nothing was done to stop this illegal grading policy.[67]

### 2. Placide & Shamlin

Plaintiff has also sued Shilonda Shamlin and Charlotte Placide in both their official and individual capacities. Since the jurisprudence is clear that suing a public official in their official capacities is really suing the public entities for which they work, the same analysis set forth above regarding the School Board applies in this regard.

■ With respect to Plaintiff's suit against Shamlin and Placide in their individual capacities, the Court must engage in the inquiry set forth above. First, the Court must determine whether the Plaintiff has alleged the violation of a clearly established constitutional right. The Court finds Plaintiff has made such an allegation. Plaintiff had a First Amend-

ment right to free speech in objecting to a grading policy that was in violation of Louisiana law and School Board policy.

Plaintiff also contends she had a free speech right in the actual grade she assigned to each student as was held by the Sixth Circuit in *Parate v. Isibor*.[68] Parate, a college professor at Tennessee State University, was instructed by Isibor, the Dean of the School of Engineering and Technology, to change the grades he had given to two students in his class. When Parate refused, he was insulted and berated by Isibor.[69] Parate was also threatened that his lack of cooperation could "mess up" his future evaluation.[70] When Parate's employment contract was not renewed at the end of the school year, Parate filed suit alleging claims under 42 U.S.C. § 1983 and the First Amendment.

The court held: "Because the assignment of a letter grade is symbolic communication intended to send a specific message to the student, the individual professor's communicative act is entitled to some measure of First Amendment protection."[71] The court continued: "Although the individual professor does not escape the reasonable review of university officials in the assignment of grades, she

---

**67.** The Court hopes that the School Board has not closed its eyes to other violations of Louisiana law and School Board policy. The primary focus of the School Board should be the teaching of the students so they can learn the material and pass the tests, not change grades when such action will not improve what the child knows.

**68.** 868 F.2d 821 (6th Cir.1989).

**69.** *Id.* at 824.

**70.** *Id.*

**71.** *Id.* at 827, citing *Tinker v. Des Moines Indep. Community School District*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 735–36, 21 L.Ed.2d 731 (1969) (holding that students'

action, wearing black armbands, was expressive conduct entitled to First Amendment protection); *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 723–24, 15 L.Ed.2d 637 (1966) (concluding that a sit-in by black students was symbolic speech); *Monroe v. State Ct. of Fulton County*, 739 F.2d 568, 571 (11th Cir.1984) ("If [plaintiff] shows '[a]n intent to convey [a] particularized message ... and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it,' the activity falls within the scope of the first and fourteenth amendments." (quoting *Spence v. Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730–31, 41 L.Ed.2d 842 (1974))).

should remain free to decide, according to her own professional judgment, what grades to assign and what grades not to assign." [72] In *Parate*, the district court "had concluded 'that a refusal to change a grade does not rise to the level of a constitutionally protected First Amendment right.' " [73] However, the Fifth Circuit expressly overruled this finding, holding that "[t]he defendant's act of *ordering Parate* to change the grade, rather than the act of giving Student 'Y' a different grade than Parate desired, gives rise to the constitutional violation." [74]

While the Court recognizes that the authority a university professor has may be different than an elementary school teacher based on the circumstances and the academic level involved, the Court finds that the same principle set forth by the *Parate* court applies under the facts of this case. Plaintiff contends and has presented summary judgment evidence to show that she was ordered to change students' grades in violation of Louisiana law and School Board policy. Following *Parate*, this alleged act gives rise to a constitutional violation.

██ Next, the Court must determine whether the Defendants' conduct was objectively reasonable in light of clearly established constitutional law. As previously mentioned, the record reflects that upon receiving knowledge of Shamlin's policy, all superior School Board officials involved took no action to stop the policy or discipline Shamlin. In short, the School Board turned its back on Shamlin's illegal activity even though the rule she implemented and required teachers to follow was a violation of Louisiana law and School Board policy. The Court finds that, at the very least, Plaintiff has presented sufficient summary judgment evidence which has created genuine issues of material facts in this case. Not only do the facts establish a material issue of facts in dispute, but the Court finds it very difficult as a matter of law to find Shamlin and Placide are entitled to qualified immunity when the policy they implemented and approved was a violation of Louisiana law and School Board policy. The Court believes Plaintiff deserves her day in Court.

Accordingly, summary judgment in favor of the Defendants on the issue of qualified immunity is denied.

### D. Substantive Due Process Claim

██ Plaintiff has also alleged a substantive due process claim under the Fourteenth Amendment for a liberty interest in her reputation upon which Defendants have moved for summary judgment. The Court notes that Plaintiff failed to oppose this portion of Defendant's motion in her opposition brief; therefore, under Local Rule 7.4, [75] the Court must assume Plaintiff has no opposition to this motion. The Court also finds that this claim should be dismissed under the law and facts of the case. Therefore, Defendants' motion for summary judgment is granted on Plaintiff's substantive due process claim.

---

72. *Id.* at 828.

73. *Id.* at 829, quoting *Parate v. Isibor*, No. 3–86–0311, slip op. at 7 (M.D.Tenn. Aug. 28, 1987).

74. *Id.* (emphasis in original).

75. *See* Local Rule 7.4, which requires "[e]ach respondent opposing a motion is required [to] file a response, including opposing affidavits, memorandum, and such supporting documents as are then available, within 21 days after service of the motion."

## E. State Law Claims

■ Plaintiff has also brought a claim under the Louisiana Whistleblower Statute, La. R.S. 23:967. Pursuant to its authority under 28 U.S.C. § 1367, the Court declines to exercise supplemental jurisdiction over this claim, and it will be dismissed WITHOUT prejudice.

## III. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment granted is as to Plaintiff's substantive due process claim without opposition from the Plaintiff. Defendants' motion for summary judgment is denied on all other remaining federal claims. Plaintiff's state law claims are dismissed without prejudice.

IT IS SO ORDERED.