United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 18, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 06-30017

---

JUDITH BROWN DAVIS

Plaintiff - Appellant

v.

ALLEN PARISH SERVICE DISTRICT, doing business as Hospital of
Allen Parish; ET Al

Defendants

ALLEN PARISH SERVICE DISTRICT, doing business as Hospital of
Allen Parish

Defendant - Appellee

---

Appeal from the United States District Court
for the Western District of Louisiana, Lake Charles
No. 2:04-CV-938

---

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Plaintiff-appellant Judith Brown Davis filed a suit under 42
U.S.C. § 1983 against her former employer, defendant-appellee
Allen Parish Service District, alleging, <u>inter alia</u>, that she was
terminated in violation of her right to free speech under the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

First Amendment and the Louisiana Constitution, Article 1, § 7. Allen Parish Service District filed a motion for summary judgment on Davis's employment retaliation claims, which the district court granted after determining that no constitutional violation occurred. Davis now appeals the district court's grant of summary judgment. We AFFIRM.

## I. FACTUAL BACKGROUND

Plaintiff-appellant Judith Brown Davis is a registered nurse who began her employment with defendant-appellant Allen Parish Service District ("Allen Parish Hospital" or "Hospital") in November 1998. She was terminated on May 5, 2003, for events involving a mentally unstable patient on the evening of May 1, 2003.

Davis was employed in the acute care/psychiatric unit of Allen Parish Hospital. The Allen Parish Hospital psychiatric unit treats patients with mental instability and substance abuse issues. Davis's responsibilities in the psychiatric unit included giving medications, monitoring patients, and admitting and discharging patients.

On Thursday, May 1, 2003, Davis reported to the Hospital at approximately 7:00 p.m. to begin working a night shift. Davis was the charge nurse for the shift, meaning that she was the highest ranking hospital employee in the unit and had limited supervisory authority over the other nurses and medical

2

technicians working that evening.  She replaced Assistant Director of Nursing Laurie Manuel, who was completing the day shift.  As Davis and Manuel transferred duties, they discussed the behavior of a patient who was making intermittent threats toward the United States President and government facilities and property.  These threats included remarks that the patient and his friends intended to harm the President and destroy government property and structures.  The patient was of Middle Eastern descent and often spoke in a foreign language.  The patient was confined to the ward but had access to a telephone.  Davis had previously observed the patient speaking on the phone in a Middle Eastern language.  She believed that his calls were to locations out of the country.  Davis alleges that she and Manuel agreed that if the patient continued to make threats, the United States Secret Service would be contacted on the following Monday.

At approximately 8:00 p.m. that evening, the patient began making more intense threats.  He began "cursing and hollering" in English and Arabic, making threats to the President, the government, and hospital staff.  The patient threatened that he and some people he knew were going to blow up oil fields near Houston, Texas, that he and his friend would use their planes to go to Washington to kill the President, that September 11 was nothing compared to what was coming, and that he would call his friends and have the President killed.  As a result of this behavior, Davis and the ward assistants placed the patient in

3

four-point restraints, isolated him, and applied sedating medication.

After restraining the patient, Davis called Manuel and Barbara Morgan, Assistant Hospital Director, at their homes. Davis alleges that each told her that she should do what she thought needed to be done regarding reporting the patient's behavior to the proper authorities. Davis then called the Secret Service to report the patient's threats against the President.[1] Her conversation lasted approximately fifteen to twenty minutes, during which she reported the patient's threats and answered an agent's questions about the patient's behavior. She ended the remainder of her shift without further incident with the patient and left the hospital at 7:00 a.m. Friday morning, May 2, 2003.

Later on Friday, Colleen Unkel, the Director of Clinical Services, advised Scott Barrilleaux, the Administrator/Director of the Hospital, about the events of the previous night, including Davis's call to the Secret Service. Barrilleaux was speaking on the telephone to the Hospital's attorney, Richard MacMillan, about another matter when Unkel made her report. In

---

[1] Davis indicates that she had interacted with the Secret Service approximately two years earlier while employed at the Hospital. According to Davis, an individual called the Hospital and made threats toward the President and the government. A psychiatrist at the Hospital suggested that Davis call the Secret Service. She did so, and Secret Service agents came to the Hospital to speak to her. The agents instructed Davis that she was correct to call the Secret Service, that they would investigate and assess the credibility of any threats, and that she should report any future threats to them.

4

response to Unkel's report, MacMillan advised Barrilleaux that Davis should be terminated for violating patient confidentiality. Barrilleaux conducted an investigation, which included: reviewing Davis's personnel file, which contained disciplinary reports concerning prior incidents with patients; speaking with other Hospital personnel about Davis; and speaking with Ronald Craiger, the Chairman of the Board of Commissioners for Allen Parish Hospital. Craiger instructed Barrilleaux to follow the Hospital attorney's directions and terminate Davis's employment.

On Monday, May 5, 2003, Director of Nursing Vickie Neely called Davis and asked her to report to the hospital early that afternoon, before her scheduled 7:00 p.m. shift. When Davis arrived, she met with Neely and Unkel. Neely told Davis that she was terminating her and gave her a copy of her discharge notice, which indicated the reason for her discharge as: "Violated patient confidentiality by calling Secret Service. Used poor judgment." As Davis left the Hospital, she passed Barrilleaux and requested a meeting to discuss her termination. Davis and Barrilleaux met the next day, and she requested that he reconsider her termination. Barrilleaux agreed to speak with the Hospital's attorney and Chairman of the Board. He was advised that the termination would not be revoked, and he then communicated that information to Davis.

## II. PROCEDURAL HISTORY

5

Davis filed this action under 42 U.S.C. § 1983 against Allen Parish Hospital and Scott Barrilleaux on April 26, 2004. Davis claimed, <u>inter alia</u>, that Allen Parish Hospital and Barrilleaux, individually and in his official capacity as Director of Allen Parish Hospital, deprived her of employment in violation of the First Amendment of the U.S. Constitution and Article 1, § 7 of the Louisiana Constitution.[2] Specifically, Davis claimed that her phone call to the Secret Service was speech protected under the First Amendment, and therefore her termination as a result of that speech violated the Constitution.

On June 28, 2005, after discovery was completed, each defendant filed a motion for summary judgment on all claims.[3] Allen Parish Hospital adopted Barrilleaux's arguments <u>in toto</u> and

---

[2] Davis also claimed termination in violation of other provisions of the U.S. and Louisiana Constitutions, invasion of privacy and defamation under Louisiana state law, and termination in violation of Louisiana Revised Statute 23:967, Louisiana's Whistleblower Statute. On July 21, 2005, after the defendants filed motions for summary judgment, Davis voluntarily withdrew the invasion-of-privacy claim against both defendants, the First Amendment claim against Barrilleaux in his official capacity, and the claim against Barrilleaux individually for violation of Louisiana Revised Statute 23:967. Because Davis appeals only the grant of summary judgment to Allen Parish Hospital on her claims brought under the First Amendment and Louisiana Constitution, Article 1, § 7, we limit our discussion of her claims accordingly.

[3] The claims remaining before the district court were those against Allen Parish Hospital and Barrilleaux individually for termination in violation of the U.S. and Louisiana Constitutions and against Allen Parish Hospital and Barrilleaux in his official capacity for defamation and violation of Louisiana Revised Statute 23:967.

made no independent arguments for summary judgment on the First Amendment and Louisiana Constitution claims. Although Barrilleaux is not a party to this appeal, because the Hospital relied on his arguments, we review them briefly here. Barrilleaux argued that he could not be held liable individually for Davis's termination because he was not the final decision maker with respect to the decision made. Barrilleaux also asserted the defense of qualified immunity, relying heavily on the factual circumstances surrounding Davis's phone call to the Secret Service. He argued that no constitutional violation had occurred because Davis was terminated for exercising poor judgment and violating patient confidentiality, not because of her speech. Barrilleaux additionally argued that he was entitled to qualified immunity because his conduct in terminating Davis was objectively reasonable.

On September 1, 2005, the district court issued an order, notifying the parties that because the motions for summary judgment did not address all of Davis's claims, the court would consider, <u>sua sponte</u>, summary judgment on Davis's remaining claims. The order directed Davis to file "all competent summary judgment evidence relating to any and all claims" against the defendants, and it further permitted the defendants to respond. All three parties complied with the court's order.

The district court granted Barrilleaux's and Allen Parish Hospital's motions for summary judgment on all claims on October

7

4, 2005.  The court concluded that Barrilleaux could not be held liable individually because he was not the final decision maker in Davis's termination decision.  Noting that neither this defense nor the defense of qualified immunity was available to the Hospital, the court concluded that the Hospital was independently entitled to summary judgment because no constitutional violation had occurred.  After evaluating the content, form, and context of Davis's statements, the court determined that Davis's phone call to the Secret Service did not relate to a matter of public concern.  The court also weighed Davis's interest in speaking against the interests of the Hospital, indicating that the Hospital's interests were greater:

> There is no constitutional right which affords unfettered free speech protection to a healthcare professional who chooses to disclose information learned from or about a patient in the course of treatment.  Bound by the duties of doctor-patient privilege, it is the exception and not the rule which would allow Ms. Davis to discuss such information with anyone outside of the hospital.

Davis now appeals only the grant of summary judgment to Allen Parish Hospital on her First Amendment and Louisiana Constitution, Article 1, § 7 claims.

### III. STANDARD OF REVIEW

We review grants or denials of motions for summary judgment de novo, applying the same standard as the district court. MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 478 (5th Cir.

8

2003).  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Id.; FED. R. CIV. P. 56(c).  On summary judgment, the evidence and the inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party.  MacLachlan, 350 F.3d at 478.

Davis argues that the district court erred in determining that her speech was not related to a matter of public concern and consequently that no violation of the First Amendment occurred.  She additionally argues that summary judgment is improper because her interest in speaking outweighs the Hospital's interest in efficient operation under Pickering v. Board of Education, 391 U.S. 563 (1968).  We review legal questions concerning the First Amendment de novo.  Salge v. Edna Indep. Sch. Dist., 411 F.3d 178, 184 (5th Cir. 2005).  In reviewing First Amendment issues, we are required to undertake an independent examination of the entire record.  Rankin v. McPherson, 483 U.S. 378, 386 n.9 (1987).  Whether an employee's speech relates to a matter of public concern is a question of law that is determined by the court.  Tompkins v. Vickers, 26 F.3d 603, 606 (5th Cir. 1994).  The Pickering balancing inquiry is also a question of law.  Salge, 411 F.3d at 184; see also Kinney v. Weaver, 367 F.3d 337, 363 (5th Cir. 2004) (en banc) ("It is for the court to determine the importance of a plaintiff's speech interest, to determine the

importance of a governmental interest in efficient operations, and to balance the relative weight of each.").

## IV. DISCUSSION

### A.    First Amendment Framework

To prevail on a First Amendment employment retaliation claim, an employee must establish four elements: (1) she suffered an adverse employment action; (2) her speech involved a matter of public concern; (3) her interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) her speech motivated the employer's adverse employment action. Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999). The parties do not dispute that the first element has been established. Rather, this case turns on the second and third elements.

The public concern and interest-balancing elements of the employment retaliation framework recognize that government employees do not surrender their constitutional rights to speak on matters of public concern simply because they are employed by the government. Connick v. Myers, 461 U.S. 138, 146 (1983). Indeed, government employees are often in the best position to comment on issues of public concern, which in turn fosters informed public debate vital to our system of self-government. See, e.g., Pickering, 391 U.S. at 571-72 (noting that teachers are "most likely to have informed and definite opinions" on the

10

question of school funding such that their ability to speak freely is "essential" to informed decision making by the electorate). Notwithstanding the important interest of employees in speaking on matters of public concern, the government has interests "as an employer in regulating the speech of its employees." Id. at 568. As a result of these competing interests, after determining whether the speech at issue relates to a matter of public concern, our constitutional inquiry must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.

**B.  Public Concern**

The public concern inquiry recognizes that if "employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices." Connick, 461 U.S. at 146. Whether an employee's speech relates to a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48.

The speech at issue in this case is Davis's phone call to the Secret Service to report a mentally unstable patient's

11

threats against the President and federal property and national resources.[4]  Davis urges us to conclude that her speech, in that it relates to the public safety, is conclusively on a matter of public concern under this court's jurisprudence.  Davis argues that the district court erred in determining that her speech was not related to a matter of public concern because the context factors it considered are properly evaluated during the Pickering balancing phase.

On the one hand, the content of Davis's speech weighs heavily in favor of a conclusion that it relates to the public concern.  Davis spoke about threats to kill the President, to destroy natural resources and government property, and to inflict damage of September 11 proportions.  In McPherson v. Rankin, we evaluated the content of an employee's hopeful comment regarding a future assassination attempt on the President's life.  786 F.2d 1233 (5th Cir. 1986), aff'd, 483 U.S. 378 (1987).  Despite the inappropriate and controversial nature of the speech in Rankin, we concluded that "the life and death of the President are obviously matters of public concern."  Id. at 1236.  Moreover, this court has recognized that speech "that potentially affects public safety relates to the public concern."  Kennedy v.

<hr>

4 Neither party argues the applicability vel non of the Supreme Court's recent decision in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), to our public concern analysis.  Because we resolve this case under Pickering balancing we do not consider, under Garcetti, whether Davis spoke pursuant to her official responsibilities as charge nurse.  Id. at 1959-61.

12

Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 373 (5th Cir. 2000) (concluding that a library employee's letter addressing safeguards at the library after a rape occurred there was protected speech because the public would be interested in public safety at the library); see also Thompson v. City of Starkville, 901 F.2d 456, 466 (5th Cir. 1990) (concluding that a police officer's allegations about officer misconduct related to the public concern in part because widespread misbehavior within a police force could affect pubic safety); Moore v. Miss. Valley State Univ., 871 F.2d 545, 551 (5th Cir. 1989) (contemplating that complaints would rise to a matter of public concern if they had been framed as warnings that an employee was a threat to co-workers and children instead of as internal complaints that workplace rules be enforced equally).  When viewed in light of this public safety jurisprudence, Davis has a strong argument that her statements fall within the public concern.

The form of Davis's speech——a brief phone call to an external law enforcement agency——also leans in favor of a conclusion that Davis's speech falls within the public concern. The form of Davis's speech is similar to that we considered in Price v. Brittain, 874 F.2d 252, 259 (5th Cir. 1989).  In Price, we evaluated phone calls from a social worker to the Department of Justice and other legal enforcement agencies to report illegal activity occurring within a state mental facility, concluding

13

that the form of those reports indicated the speech related to the public concern.

On the other hand, the context of Davis's speech weighs against a conclusion that it falls within the public concern. The context inquiry analyzes the underlying philosophical, political, and social circumstances surrounding an employee's speech. Moore v. City of Kilgore, 877 F.2d 364, 371 (5th Cir. 1989). As the district court noted, Davis reported the threats of a delusional and restrained psychiatric patient. Not only had the threats been occurring for some time while the patient was under a doctor's supervision and care, but the patient, who was restrained, was in no position to act on his threats. Furthermore, the patient's doctor was scheduled to examine the patient the next morning. The district court also noted that Davis breached the Hospital's confidentiality policy in reporting the patient's threats.

Davis argues that it is error to consider these circumstances as context factors within the public concern determination. We agree that violation of an internal confidentiality policy when speaking "has no relevance to whether the subject matter of the speech is on a matter of public concern" and that confidentiality policies are properly considered during Pickering balancing when weighing the employer's interest. Salge, 411 F.3d at 185. But it is proper to consider the position of the speaker within the workplace and

how the position relates to the speaker's familiarity with or access to information about the issues on which she speaks. See id. at 188 (reviewing the speaker's position as a secretary, her responsibility for maintaining good communications with the public, and her thirty-three years of experience in the position to conclude that her speech was of greater importance because of the speaker's familiarity with the issues faced). Here, the fact that Davis made her phone call at night when the patient was restrained and unable to act on his threats, combined with her position as a nurse rather than the patient's treating physician——who was undoubtedly the person with the best ability to gauge the credibility of the patient's threats——weighs against a determination that her speech falls within the public concern. These context factors indicate that the patient was not an immediate safety risk and that Davis was not the proper person within the hospital to assess and report the patient's threats.

Rather than resolve the public concern question, we may assume without deciding that Davis's speech relates to a matter of public concern because we conclude that Davis's claim ultimately fails under Pickering balancing.

## C.  **Pickering Balancing**

Davis urges that we remand her case to the district court for Pickering balancing, asserting that it is improper for us to consider this evidence here because arguments were not made below

and because the district court did not decide the Pickering balancing issue. We are unpersuaded by Davis's arguments. This court may affirm on any ground supported by the record below. U.S. ex rel. Doe v. Dow Chem. Co., 343 F.3d 325, 330 (5th Cir. 2003). The record reveals that Davis did raise Pickering balancing, however briefly, in her response to the defendants' motions for summary judgment. More importantly, engaging in Pickering balancing is proper now because the district court notified the parties that the summary judgment motions did not address all of Davis's claims and that it would consider summary judgment on all claims sua sponte. The court ordered the parties to file all competent summary judgment evidence, and all parties responded.[5] Accordingly, Davis had adequate notice and opportunity to be heard regarding Pickering balancing. Subsequently, the district court's ruling did weigh the interests of the parties, succinctly concluding that the Hospital's confidentiality policy and the doctor-patient privilege outweighed Davis's interest in speaking about information gained from a patient in the course of treatment. We therefore conclude that our resolution of this case under Pickering balancing is proper.

Under Pickering and its progeny, our task "is to seek 'a balance between the interests of the [employee], as a citizen, in

_____

[5] Davis has not contended, either below or here, that the period granted for a response was insufficient.

16

commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Connick, 461 U.S. at 142 (quoting Pickering, 391 U.S. at 568). This analysis "in reality is a sliding scale or spectrum upon which 'public concern is weighed against disruption'" to the government's efficient operation. Vojvodich v. Lopez, 48 F.3d 879, 885 (5th Cir. 1995) (quoting Click v. Copeland, 970 F.2d 106, 112 (5th Cir. 1992) (internal quotations omitted)).

Because of the wide variety of situations in which the employment retaliation issue may arise, our balancing inquiry requires the particularized consideration of the facts of each case. Connick, 461 U.S. at 154. We look to the non-exclusive factors articulated by the Supreme Court in Connick for guidance in determining the parties' interests and the respective weights of those interests. These factors include the degree to which the employee's protected activity involved a matter of public concern and the gravity of that concern; the extent to which the employee's protected activities may have affected close working relationships; the time, place, and manner of the employee's protected activities; and the context in which the employee's activities were carried out. Connick, 461 U.S. at 151-53; see also Vojvodich, 48 F.3d at 885 (reciting and applying the Connick considerations).

17

Although we assume that Davis's speech meets the threshold public concern requirement, the gravity of the patient's threats and the context in which Davis spoke indicates that her interest in speaking was limited.  See Salge, 411 F.3d at 195 (considering both whether the speech at issue was accurate or confidential and the context of the speech in determining its value for balancing).  As a general proposition, the public has a strong interest in being informed about threats to the public safety. The public's legitimate interest in the threats in this case, however, is tempered by considerations of whether Davis's position in the workplace made her an informed and appropriate speaker and whether those threats were reported at the appropriate time under the circumstances.  See id. at 188.  Davis spoke at a time when the patient was restrained, sedated, and isolated and was therefore unable to effectuate any threats for the remainder of the evening.  Additionally, the patient was under a psychiatrist's care and had been expressing similar threats during his hospitalization.  Given these circumstances, and the fact that the patient was delusional, the patient's doctor was undoubtedly in a better position than Davis to assess the gravity of the patient's threats and to decide whether law enforcement authorities should be notified.  Furthermore, because the doctor was scheduled to examine the patient the following day and because the patient was restrained overnight, Davis's

18

concerns could have been adequately addressed by the doctor.  We

conclude, then, that Davis had a limited interest in speaking.

In evaluating the government employer's interest, we focus

on the effective functioning of the employer's operations.

Pertinent considerations include "whether the statement impairs

discipline by superiors or harmony among co-workers, has a

detrimental impact on close working relationships for which

personal loyalty or confidence are necessary, or impedes the

performance of the speaker's duties or interferes with the

regular operation of the enterprise."  Rankin, 483 U.S. at 388.

The Supreme Court has recognized that "[i]nterference with work,

personnel relationships, or the speaker's job performance can

detract from the public employer's function; avoiding such

interference can be a strong state interest."  Id.

The Hospital put forward evidence that Davis's speech

breached the Hospital's confidentiality policy relating to the

release of patient information.[6]  The Hospital's policy provides

---

[6]  The Hospital's confidentiality policy provides:

> Information about a patient's condition,
> care, treatment, personal affairs, or records
> is confidential and may not be discussed with
> anyone except for those responsible for
> patient care and treatment without the full
> consent of the patient or when compelled by
> legal requirements.  Only under these
> conditions with specific approval of the
> Administrator of the Hospital can employees
> discuss a patients [sic] condition.
> Carelessness or thoughtlessness leading to the
> release of patient information may result in

19

that a patient's "condition, care, treatment, personal affairs, or records" cannot be discussed with persons beyond those responsible for the patient's care unless the patient consents or the law requires disclosure. Even under those circumstances, the policy further provides that patient information is not to be released without the approval of the Administrator of the Hospital, Barrilleaux. This policy was set forth in an acknowledgment that Davis signed when she was hired.

Davis argues that she did not breach the Hospital's policy because she did not release confidential information when she phoned the Secret Service and, alternatively, that any breach was minor because she discussed the situation with Manuel and Morgan before notifying the Secret Service. But Davis undoubtedly did violate the language of the policy by phoning the Secret Service, an external entity uninvolved with the patient's treatment; discussing a patient's condition, care, treatment, and personal affairs;[7] and doing so without gaining approval from Barrilleaux. Her argument that any breach of the policy was minor by virtue of her conversations with Manuel and Morgan is without merit. The confidentiality policy clearly indicates that approval must be

discipline up to an [sic] including discharge.

[7] Davis's deposition indicates that she reported the patient's threats to a Secret Service agent and answered the questions posed by the agent. The agent asked: what the patient's diagnosis was, if he was on any medicines, if he had been in the Hospital for a while, and where the patient lived.

20

granted by the Hospital Administrator. Neither Manuel, Assistant Director of Nursing, nor Unkel, Assistant Hospital Director, occupies the position of Hospital Administrator, and so Davis's discussions with them prior to phoning the Secret Service do not satisfy the confidentiality policy's requirements.

Breach of the Hospital's internal confidentiality policy establishes a strong governmental interest in this case in that the breach reflects an impairment of Davis's ability to perform her duties and a disruption to government operations. We are mindful that the government's operations in these particular circumstances involve a psychiatric unit housing mentally unstable patients. In a facility housing individuals who are mentally disturbed, the employer's need to maintain order among employees and to limit internal disruption to psychiatric care is paramount. See, e.g., Price, 874 F.2d at 258-59. Moreover, the Hospital has a strong interest in maintaining patient confidentiality in order to protect the privacy of patients and ensure their effective treatment and to satisfy the Hospital's legal obligations. We thus conclude that the Hospital has a particularly weighty interest.

Balancing the Hospital's weighty interest in maintaining order in the psychiatric unit against Davis's more limited interest in speaking, we conclude, as did the district court, that the Hospital's interest clearly outweighs Davis's. Under the distinct facts of this case, the district court did not err

in concluding that the Hospital's act in terminating Davis did not violate the First Amendment.

Inasmuch as we have determined that summary judgment in favor of Allen Parish Hospital was proper on Davis's § 1983 First Amendment claim, it was also proper on her claim brought under the Louisiana Constitution.  State v. Franzone, 384 So.2d 409, 411 (La. 1980); see also Delcarpio v. St. Tammany Parish Sch. Bd., 865 F.Supp. 350, 362-63 (E.D. La. 1994), rev'd on other grounds, 64 F.3d 184 (5th Cir. 1995).

## V. CONCLUSION

For the foregoing reasons, the ruling of the district court is AFFIRMED.