# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00275-CV

**Georgia Clark, Appellant**

**v.**

**Fort Worth Independent School District, Appellee**

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-008899, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant, Georgia Clark, challenges the termination of her continuing contract with Fort Worth Independent School District where she was a high-school teacher. Although an independent hearing examiner recommended that Clark's contract not be terminated, the school district decided to terminate Clark's contract. Clark appealed to the Commissioner, who reversed the school district's decision. The school district appealed to the district court, which reversed the Commissioner's decision and reinstated the school district's decision to terminate Clark's contract. Clark's first three issues challenge the school district's decision based on the statutory requirements for a school board's written decision terminating a teacher's contract. Specifically, Clark asserts that the Commissioner correctly determined that: (1) the board failed to adopt conclusions of law sufficient to support the determination that good cause existed to terminate Clark's contract; (2) the board failed to state the legal basis and reasons for changing or rejecting the hearing examiner's proposed conclusions of law; and (3) the board failed to establish that Clark

violated the holding in *Plyler v. Doe*, 457 U.S. 202 (1982). Clark's fourth issue raises a First Amendment claim. We affirm the district court's final judgment.

## FACTS

Clark was employed by Fort Worth ISD under a continuing contract during the 2018–2019 school year. In May 2019, Clark publicly posted the following tweets on the social-media platform Twitter, which were directed to then-President Donald Trump:[1]

**[posted May 17, 2019]**

Mr. President, Fort Worth Independent School District is loaded with illegal students from Mexico. Carter-Riverside High School has been taken over by them. Drug dealers are on our campus and nothing was done to them when drug dogs found the evidence.

I contacted the feds here in Fort Worth a few months ago and the person I spoke with did not want to help me or even listen to me. The campus police officer spends his time texting on his cell phone and doing the bidding of Jennifer Orona, Hispanic assistant . . .

. . . principal who protects certain students from criminal prosecution. There is fraud being committed by Orona and how the Special Education Department on our campus is being run. FWISD knows about this and turns a blind eye to it.

I need protection from recrimination should I report to the authorities but I do not know where to turn. I contacted the Texas Education Agency and then my teacher organization. Texas will not protect whistle blowers. The Mexicans refuse to honor our flag.

I do not know what to do. Anything you can do to remove the illegals from Fort Worth would be greatly appreciated. My phone number is [. . .] and my cell is [. . .]. Georgia Clark is my real name. Thank you.

**[posted May 22, 2019]**

Mr. President, I asked for assistance in reporting illegal immigrants in the FWISD public school system and I received an alarming tweet from someone identifying

---

[1] The hearing examiner made findings of fact that Clark believed she was communicating with the president privately. However, her tweets were posted publicly.

2

himself as one of your assistants followed by a second tweet from the same person
. . .

. . . with the f word used in the dot com.  I promptly deleted both tweets and sent a message to Twitter about it.  I really need a contact here in Fort Worth who should be actively investigating and removing the illegals that are in our public school system.  Thank you.

The school district was notified of the tweets on May 29, 2019, two days before the school year ended.  That same day, the school district placed Clark on administrative leave.  Also on the same day, multiple news outlets began publishing stories regarding the tweets and requesting information from the school.

The school district received multiple emails from concerned current and former students, parents, and community members.  During the school board's June 4, 2019 meeting, fourteen members of the public spoke about their concerns regarding the tweets during the public-comment portion of the meeting.  Their concerns included that students may be kept home from school due to fear created by the tweets and that the tweets could affect students' learning, mental health, and general well-being.  After hearing public comment, the board voted unanimously to propose the termination of Clark's contract.

Clark then requested a hearing before an independent hearing examiner.  *See* Tex. Educ. Code § 21.253.  The hearing examiner held an evidentiary hearing, issued findings of fact and conclusions of law, and ultimately recommended that Clark's contract not be terminated.  He concluded that there was not good cause for termination because Clark's tweets did not violate any state or federal law or policy and that her tweets were protected free speech and her interests outweighed the district's.  Regarding the disturbance caused to the district, the examiner found that on May 28, 2019, the district began receiving numerous comments through social media websites, phone calls, emails, and text messages expressing concern, support, and outrage

3

regarding the tweets, and began receiving media inquiries the next day. The examiner also found that at least one individual tweeted an intent to come onto district property to visit Clark regarding her tweets; the district superintendent received a text message that included "nice house by the way," which he felt threatened by and which caused him to file a police report; the school's principal testified that at least one parent wanted to keep her children home from school out of fear resulting from the tweets and the public reaction to them; the district's social media coordinator testified that the volume of the reaction made it more difficult for her to perform her duty of monitoring social media for threats to the district for a short time; the public reaction caused "some disruption to [district] operations and created concern about safety and security for students and staff at" the district; and the tweets were "the subject of widespread publicity by numerous media outlets beginning on May 29, 2019, including local, national, and international outlets." The examiner also made the following specific findings regarding a school board meeting at which members of the public made public comment regarding Clark's tweets:

> During the Public Comment portion of the June 4, 2019, Board meeting, fourteen people, including parents, current and former students, and community members, expressed concern and serious reservations regarding Ms. Clark's ability to fairly educate students at [the district] without bias or discriminatory animus. . . .

> At least one commenter at the Public Comment portion of the June 4, 2019, Board meeting expressed the concern that Ms. Clark's tweets could have a chilling effect on immigrant students attending school at [the district].

> Several commenters at the Public Comment portion of the June 4, 2019, Board meeting expressed their concern that Ms. Clark's tweets and classroom conduct could affect students' learning, mental health, and general well-being.

> Following the June 4, 2019 Board meeting, [the district] and its staff and officials continued to receive numerous phone calls, emails, and other messages regarding Ms. Clark's conduct and [the district's] decision to propose termination of her contract.

4

The examiner concluded that "Clark's tweets were free speech," her tweets were statements of a citizen on a matter of public concern protected by the U.S. constitution, the evidence was not sufficient to show that the tweets caused a substantial and continuing disruption to the efficient functioning of the district, and her interest in free speech outweighed the district's interest in the efficient provision of public services.

The board later issued its decision to terminate Clark's contract, based on its determination that good cause existed to do so. *See id.* § 21.257(a-1) (authorizing board to reject determination by hearing examiner regarding good cause), .259(b)(1)(same). The district concluded that good cause existed because Clark's tweets "failed to comply with both the District's policies and federal law by publicly attempting to instigate the removal of FWISD students based on their ethnicity and/or immigration status." The district also concluded that its interest outweighed Clark's.

Clark appealed the board's decision to the Commissioner. *See id.* § 21.301(a). The Commissioner reversed the school district's decision to terminate Clark's contract and ordered her either to be reinstated with backpay and benefits or to be paid one year's salary from the date she would have been reinstated. The commissioner concluded that the school district had not entered any conclusions of law regarding good cause. The Commissioner declined to resolve the *Pickering*[2] balance test regarding Clark's free speech retaliation claim, and thus did not decide the First Amendment issue.

---

[2] *Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968).

The school district appealed the Commissioner's decision to the district court. *Id.* § 21.307. The district court reversed the Commissioner and reinstated the board's decision. This appeal followed.

## STANDARD OF REVIEW

In reviewing the district court's judgment, we focus on the decision of the Commissioner. *See id.*; *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). We "may not reverse the decision of the commissioner unless the decision was not supported by substantial evidence or unless the commissioner's conclusions of law are erroneous." Tex. Educ. Code § 21.307(f). Under substantial-evidence review, we

> shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (A) in violation of a constitutional or statutory provision;
>
> (B) in excess of the agency's statutory authority;
>
> (C) made through unlawful procedure;
>
> (D) affected by other error of law;
>
> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>
> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2).

Substantial-evidence review requires "'only more than a mere scintilla,' to support an agency's determination." *Davis*, 34 S.W.3d at 566 (quoting *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792–93 (Tex. 1995)). "Essentially, this is a rational-basis test to

6

determine, as a matter of law, whether an agency's order finds reasonable support in the record." *Jenkins v. Crosby Indep. Sch. Dist.*, 537 S.W.3d 142, 149 (Tex. App.—Austin 2017, no pet.). "[T]he evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). Any legal basis in the record may support affirming the Commissioner's decision. *Edinburg Consol. Indep. Sch. Dist. v. Esparza*, 603 S.W.3d 468, 478 (Tex. App.—Corpus Christi–Edinburg 2020, no pet.); *Goodie v. Houston Indep. Sch. Dist.*, 57 S.W.3d 646, 650 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see Texas Emp. Comm'n v. Hays*, 360 S.W.2d 525, 527 (Tex. 1962) ("If the Commission's conclusion was correct, it is immaterial that it may have proceeded to the conclusion on an erroneous theory or may have given an unsound reason for reaching it."). But "[t]he Commissioner may not substitute his or her judgment for that of the board unless the board's decision is: (1) arbitrary, capricious, or unlawful; or (2) not supported by substantial evidence." *Esparza*, 603 S.W.3d at 471; *see* Tex. Educ. Code § 21.303(b).

## ANALYSIS

**Good Cause**

We turn first to Clark's three issues that concern the good-cause determination. A school district may terminate a teacher's continuing contract at any time for good cause. Tex. Educ. Code §§ 21.154(4), .156(a). Good cause in the context of terminating a continuing contract is statutorily defined as "the failure to meet the accepted standards of conduct for the profession as generally recognized and applied in similarly situated school districts in this state." *Id.* § 21.156(a).

7

When a school district proposes termination of a teacher's contract, the teacher may request a hearing before an independent hearing examiner, who is assigned by the Commissioner. *Id.* § 21.253. The hearing examiner must issue a written recommendation that includes findings of fact and conclusions of law and may include a proposal for granting relief. *See id.* §§ 21.251–.257.

After considering the hearing examiner's recommendation, a school board must announce a decision that includes findings of fact and conclusions of law, and the board must "state in writing the reason and legal basis for a change or rejection" made to a conclusion of law or a finding of fact of the hearing examiner. *See id.* §§ 21.258–.259(a)(1), (d). A school board is permitted to "adopt, reject, or change the hearing examiner's: (1) conclusions of law, including a determination regarding good cause for suspension without pay or termination; or (2) proposal for granting relief." *Id.* § 21.259(b)(1). However, a school board may only reject or change a finding of fact of the hearing examiner if the finding of fact is not supported by substantial evidence. *Id.* § 21.259(c). Notably, a hearing examiner's determination regarding good cause for termination is considered a conclusion of law. *Id.* § 21.259(b)(1).

A teacher may appeal the board's decision to terminate the teacher's contract to the Commissioner. *See id.* § 21.301. The Commissioner may not reverse a board's decision to terminate a teacher's contract unless the board's decision is arbitrary, capricious, or unlawful or not supported by substantial evidence. *Id.* § 21.303(b)(1). The Commissioner may not reverse a decision of a school board based on a procedural irregularity or error by the board "unless the Commissioner determines that the irregularity or error was likely to have led to an erroneous decision." *Id.* § 21.303(c). The Commissioner must issue a written decision that includes findings

8

of fact and conclusions of law. *See id.* § 21.304. The Commissioner's decision may be appealed by either party to a district court. *Id.* § 21.307.

Here, the board rejected the hearing examiner's decision concerning good cause. The Commissioner, however, did not consider whether the board's changed and adopted conclusions of law were based on substantial evidence. *See id.* § 21.303(c). Instead, the Commissioner found that the board failed to make any conclusions of law regarding good cause. Specifically, the Commissioner concluded that:

> While the board rejected in whole or in part certain Conclusions of Law, no new or changed Conclusions of Law were adopted. There is no Conclusion of Law in [the board's] Decision that there is good cause to terminate Petitioner's contract and no Conclusions of Law which are determinations regarding good cause that support the ultimate conclusion that good cause exists to terminate Petitioner's contract.
>
> . . . .
>
> [The board] could have adopted a conclusion of law that there is good cause to terminate [Clark's] contract. It did not.

For the reasons explained below, we determine that the board adopted conclusions of law regarding good cause and that its conclusions were supported by substantial evidence. *See id.*

There is no statutory requirement that a school board adopt conclusions of law in a specific manner. The only requirements are that the decision include findings of fact and conclusions of law and that the school board "shall state in writing the reason and legal basis for a change or rejection made under this section." *Id.* § 21.259(a)(1), (d). "[T]he label attached, 'finding of fact' or 'conclusion of law,' is not determinative; the focus is on whether the issue determined is ultimately one of policy, and if so, whether a school board's decision is supported by substantial evidence and free of erroneous legal conclusions." *Davis*, 34 S.W.3d at 566.

9

The first sentence of the introduction section in the board's decision states: "The Board determines that good cause exists to terminate the employment of Georgia Clark based on the statements she publicly posted on Twitter." The same section ends with the sentence: "Accordingly, the Board rejects the Hearing Examiner's Recommendation and concludes that good cause for the termination of Ms. Clark's continuing employment contract exists in this case." The board then detailed in Section II and Section III the facts, policies, and multiple legal theories that it relied upon to reach this conclusion. In Section V, the board went through the hearing examiner's findings and conclusions and detailed which it adopted or rejected, explained which findings of fact were actually conclusions of law because they were good-cause determinations, identified which findings of fact were actually explanations of fact, and identified which findings of fact it rejected because they were unsupported by substantial evidence. The board ended its decision by restating that it found that good cause existed for the termination of Clark's contract. Based on our review of the board's written decision, which states that "based on the statements she publicly posted on Twitter[,] . . . . [the board] concludes that good cause for the termination of Ms. Clark's continuing employment contract exists in this case," and which includes detailed descriptions of the facts and legal theories relied on, we determine that the school board adopted conclusions of law regarding good cause. Thus, the Commissioner's decision based on the conclusion that the district failed to adopt any conclusions of law regarding good cause is not supported by substantial evidence. *See id.* § 21.307(f).

Because the school board adopted conclusions of law and gave written reasons and legal basis for its changes and rejections, we then look to whether the school board's decision to

10

terminate Clark's continuing contract was based on substantial evidence.[3]   Tex. Educ. Code § 21.307(g) ("The court may not reverse a decision of the commissioner based on a procedural irregularity or error by . . . the commissioner unless the court determines that the irregularity or error was likely to have led to an erroneous decision by the commissioner."); *North E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 253–54 (Tex. 2020) (determining that Commissioner's reasoning for concluding good cause was error but affirming Commissioner's decision under different theory).  If the board's decision was not supported by substantial evidence, we must affirm the Commissioner's ruling.  Tex. Educ. Code §§ 21.209, .307(f).  "The question whether an agency's determination meets [the substantial evidence] standard is one of law." *Davis*, 34 S.W.3d at 566.

The Supreme Court of Texas has explained the statutory definition of "good cause" for termination under a continuing contract as follows:

> The statute requires evidence of a failure to meet generally accepted standards of professional conduct but not, as Riou suggests, evidence that similarly situated school districts would have ended her contract under these specific facts.  District policies implementing state and federal law denote generally accepted standards of professional conduct—such policies reflect standards applicable to school districts throughout the state.  Evidence of a failure to meet a district policy that implements state law supports a good cause determination.

*Riou*, 598 S.W.3d at 246.

One good-cause reason given by the school district was Clark's failure to comply with the following district policy, adopted on February 28, 2017:

> WHEREAS, the Fort Worth Independent School District Mission is to prepare ALL students for success in college, career, and community leadership; and,

---

[3] Because the Commissioner found that the school board failed to make any conclusions of law regarding good cause, he did not consider whether there is substantial evidence to support the board's decision.

11

WHEREAS, it is FWISD's commitment to our community that our schools will create a safe and caring learning environment so as to foster a culture of trust and respect; and,

WHEREAS, FWISD policy FFFI (LOCAL), prohibits discrimination, including harassment, against any student on the basis of race, color, religion, gender, sexual orientation, gender identity and expression, national origin, disability, or any other basis prohibited by law; and,

WHEREAS, under the 1982 United States Supreme Court ruling (Plyler v. Doe, 457 U.S. 202), all children are entitled to a public education regardless of their immigration status or the status of their parents; and,

WHEREAS, every student should go to school to safely learn and engage with their teachers and classmates; and,

WHEREAS, we want our community to feel that schools and classrooms are safe, welcoming, and inclusive places for all students and all families, regardless of their immigration status;

NOW, THEREFORE, BE IT RESOLVED that the Fort Worth Independent School District will strive to create the safest possible environments for its students and employees, providing them the foundation needed to learn, thrive, seek assistance and information, and reach each child's potential in an education-focused environment, free of insecurity and fear, for all its employees, students, and their families, regardless of their immigration status.

This policy cites the federal law that it implements: *Plyler v. Doe* extended the benefit of the Equal Protection Clause to undocumented school children and children of undocumented parents. 457 U.S. at 215. Undisputed evidence in the record—the tweets posted by Clark to former-President Donald Trump—supplies substantial evidence that Clark violated the school district's policy. Specifically, the school board explained that because Clark's tweets called for an investigation to identify and remove students from the school district based on immigration status, the tweets violated the district's policy. Accordingly, we hold that substantial evidence supports the school board's decision that it had good cause to terminate Clark because of her violation of district policy implementing federal law. *See Riou*, 598 S.W.3d at 246 (explaining

12

that evidence of failure to meet district policy that implements state or federal law supports good cause determination); *Davis*, 34 S.W.3d at 567.

We overrule Clark's first three issues.

**Free Speech**

Clark argues in her fourth issue that the contents of her tweets were protected free speech that the school district is prohibited from using as the basis for terminating her contract. The school district argues that it is not prohibited by free-speech protections from terminating Clark's contract because the *Pickering* balancing test weighs in the school district's favor.[4] *See Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968). Here the evidence was undisputed that Clark's tweets were not made pursuant to her official duties.

Although the parties do not dispute that the tweets included topics of public concern, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984); *see also Connick v. Myers*, 461 U.S. 138, 148, n. 7 (1983) ("The inquiry into the protected status of speech is one of law, not fact."); *City of Dallas v. Stewart*, 361 S.W.3d 562, 577 (Tex. 2012) (noting that appellate courts are required to conduct an independent factual constitutional analysis to determine whether speech falls within constitutional protections). "Speech is of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); *see also King v. Paxton*,

---

[4] The school district also argues Clark waived her free-speech rights when she signed her contract. For purposes of this opinion, we assume without deciding that Clark did not waive her free speech rights when she signed her employment contract.

576 S.W.3d 881, 902 (Tex. App.—Austin 2019, pet. denied). "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Snyder*, 562 U.S. at 453 (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

Here, Clark's tweets included expressions of concern regarding immigration, school safety, and public employee effectiveness. The additional content of her tweets while relevant to the *Pickering* balance test as discussed below, does not invalidate that her speech regarded matters of public concern. *See id.*; *see also Myers,* 461 U.S. at 149 (conducting *Pickering* balancing test where teacher was terminated for disseminating a questionnaire in which one out of fourteen questions included a matter of public concern).

Thus, we turn to the balancing test. In this context, whether Clark's speech was constitutionally protected under the First Amendment involves balancing her interests in expressing her concerns with the school district's "interest in performing its services efficiently." *See Pickering*, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."). In considering the balance, proper considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. The factor the parties focus on in this case is interference with the school district's regular operation.

14

Clark argues that the school district's interests do not outweigh her interests by emphasizing that her tweets were made off campus, after work hours, and to a public official; that her tweets concerned topics of public concern; and that she believed they were private. The school district argues that the disruption was significant and interfered with the district's interest in operating its schools in an environment in which children feel safe.

The Commissioner agreed that both Clark and the school district had significant interest in this issue:

> There is a high First Amendment interest in [Clark's] communications because they involve a citizen bringing concerns to an elected official who has authority over those claims. The First Amendment of the United States provides the right "to petition the Government for a redress of grievances."
>
> . . . .
>
> [The school district] argues that the efficient operation of its schools was harmed and would continue to be harmed due to [Clark's] communications if [Clark's] contract was not terminated. [The school district] argues that undocumented families, fearing [Clark] may attempt to have them deported, might not send their children to school. If this were to occur, [the district's] schools would be failing to achieve the central purpose of schools which is educating children. [The school district] also argues that three email threats were made after [Clark's] communications became public and that the district received many complaints. [The school district] makes a strong disruption argument.

The Commissioner did not resolve the balancing test, but the school district did, concluding that its interests outweighed Clark's.[5] The hearing examiner found that: the district

---

[5] The Fifth Circuit has noted that "*Connick* did not make 'altogether clear whether *Pickering* 'balancing' was a question of mixed law and fact, or entirely one of law.'" *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 708 n. 7 (5th Cir. 1998*)* (quoting Richard Hiers*, Public Employees' Free Speech: An Endangered Species of First Amendment Rights in Supreme Court and Eleventh Circuit Jurisprudence*, 5 U. Fla. J.L. & Pub. Pol'y 169, 281 (1993)). In an unpublished opinion the Fifth Circuit held that "[t]he *Pickering* balancing inquiry is also a question of law." *Davis v. Allen Par. Serv. Dist.*, 210 Fed. Appx. 404, 408 (5th Cir. 2006) (unpublished) (per curiam)

received numerous forms of communication from the public and the media regarding the tweets and at least two perceived threats, the principal testified that at least one parent wanted to keep her children home from school because of fear caused by the tweets and public reaction to them, there was an in-person community response including fourteen individuals speaking out about their concerns of the effects that Clark's tweets could have on students at a school board meeting, and there was widespread publicity of the tweets by local, national, and international media outlets.

Because the Commissioner may not substitute his judgment for that of the board if the board's decision is supported by substantial evidence, the dispositive question is whether the board's conclusion that the First Amendment does not prevent the termination of Clark's contract is supported by substantial evidence. *See* Tex. Educ Code § 21.303(b); *Esparza*, 603 S.W.3d at 471.

We agree that Clark has an interest in petitioning elected officials. U.S. Const. amend. I. However, the school district argues that Clark's contract was not terminated due to her expression of her political views or her attempt to petition an elected official, but for the parts of her tweets that specifically targeted a broad group of school children for identification and removal from school because either they were "illegal" or "Mexican," which created fear among the students, parents, and community.

Clark relies on evidence in the record that supports a finding that the disruption was minimal and ended on June 4, 2019, a week after the tweets were first reported to the district. The

---

(citing *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 184 (5th Cir. 2005) ("[O]ur review of the district court's *Pickering* balancing analysis is, in the absence of any disputed, material facts, also *de novo*."), and *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir.2004) (en banc) ("It is for the court to determine the importance of a plaintiff's speech interest, to determine the importance of a governmental interest in efficient operations, and to balance the relative weight of each.")).

school district admits that the public response did diminish after June 4, 2019, but correctly points out that this was the day the school board recommended termination of Clark's contract.[6] The district argues that the diminished community response coinciding with the district's recommendation for termination weighs in favor of its decision to address the disruption caused by Clark's tweets by terminating her contract.

Although Clark's tweets sought assistance from an elected official, the board's conclusions that the balance weighed in the district's favor and that her termination was not prevented by the First Amendment reasonably relied on the hearing examiner's findings of fact that the tweets created community concern regarding the effect on students' learning, mental health, and general well-being, and a possible chilling effect that could prevent some children from attending school, as well as the threats and security concerns created by the public outcry.

Thus, to the extent that the board relied on the tweets to conclude that there was good cause to terminate Clark's contract, we conclude that there was substantial evidence to support the board's decision that the First Amendment does not prohibit the district from terminating her contract. The Commissioner would not have been entitled to substitute his judgment to conclude otherwise. *See* Tex. Educ Code § 21.303(b); *Esparza*, 603 S.W.3d at 471. We overrule Clark's fourth issue.

---

[6] The record includes emails dated after June 4, 2019, from community members, some expressing anger and others expressing support for the school district's proposed decision to terminate Clark's contract.

**CONCLUSION**

For these reasons, we affirm the district court's final judgment.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Theofanis

Affirmed

Filed:   January 25, 2023